[No. 8138.]

## FORTE v. THE PEOPLE.

1. CRIMINAL LAW—*Murder—Circumstantial Evidence.* The evidence examined and held sufficient, though circumstantial, to sustain a conviction of murder in the first degree. (451, 455)

2. ——*Instructions,* are to be construed as a whole. (457)

3. JUROR—*Prior Opinion—Affidavits.* The examination of the juror upon the *voir dire,* had not been preserved. In support of his motion for a new trial the accused deposed, that on such examination one of the jurors stated that he had formed no opinion. Other affidavits disclosed that the juror had both formed and expressed the opinion that the accused was guilty. The juror himself, other jurors, and the district attorney, made affidavits that, upon his examination, he declared that he had formed and expressed an opinion which it would require evidence to remove, but if accepted he would set his opinion aside, and try the issue upon the merits, and that the accused passed the juror for cause. *Held* that the juror was not shown to be disqualified, and the court declined to disturb the findings of the District Court, to this effect. (457, 458)

*Error to Pueblo District Court.*— Hon. C. E. ESSEX, Judge.

Mr. THOMAS R. HOFFMIRE, and Mr. BERT MARTIN, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, and Mr. FRANK C. WEST, Assistant Attorney General, for the people.

Mr. JUSTICE GABBERT delivered the opinion of the court:

Plaintiff in error was convicted of murder in the first degree and sentenced to imprisonment for life. The victim was his wife. That she was murdered is beyond question, but as the conviction was had on circumstantial evidence it is urged on his behalf that the testimony to

establish the circumstances pointing to his guilt and re-
lied upon by the people was insufficient to support a ver-
dict of guilty. The evidence on the part of the people
is to the effect that deceased was at the home of her
mother in the city of Pueblo on the afternoon of Sep-
tember 18th, 1912; that she left for her home, which was
in another part of the city, and where she resided with
her husband, about five o'clock P. M., leaving one of her
children with her mother, and taking the other, a baby
about eighteen months old; that she was dressed in a
blue serge suit, and wore a ring which belonged to her
sister; that during the evening the husband and wife
were heard quarrelling, at their home, by neighbors liv-
ing across the street, which continued for at least half
an hour, during which the plaintiff in error was heard
cursing his wife, but as such quarrels were of frequent
occurrence little attention was given the matter. Mrs.
Olson, the mother of the deceased, was to be married the
next day, and, pursuant to an arrangement with her
daughter was to spend the night of the 18th at the Forte
home, and Mrs. Forte was to assist her the next day in
buying clothes. Mrs. Olson was down town the night of
the 18th with her fiance, in whose company she went to a
picture show. Later they went to a restaurant, and from
there to a ranch belonging to her intended husband, lo-
cated about one mile from the end of the street car line.
About one o'clock the morning of the 19th she arrived at
the Forte home escorted by her fiance. She observed a
light in the house, and after calling at the front door, and
receiving no answer, went to the back door and entered
the house. Neither Forte nor his wife was at home. She
found the baby asleep and the dress the deceased had
worn the day before hanging across the foot of the bed
and her every day dress in the kitchen. The bed was
stripped of covering except the sheets, one of which was
on the middle of the bed in a wad. About an hour
later Forte came in. Mrs. Olson stated that, "he was
wringing wet with sweat and white". She asked him
where he had been and he answered, at the Central Block,

and when asked what for replied, to see Bessie (the deceased). Mrs. Olson then said, what did she go there for as she knew I was coming here. Forte said, to see a real estate man, and that while he was eating supper he heard an automobile in the alley, that she went out, and that he would have killed her if he had known she was going in the automobile. Mrs. Olson further stated that Forte wanted to call a policeman, or call in the neighbors, to which she objected, as at that time her suspicions were not aroused, and she thought Bessie had gone to her, (the mother's), home for the night. Mrs. Olson and Forte remained up all night, and in the morning she took the baby to her home,—Forte saying that he would get a lay-off and come down to her house, which he did about ten o'clock that morning.

It appears from the testimony that Forte was a section hand in the employ of a railroad company, and on the 18th of September was engaged with a section crew in clearing up a wreck which had occurred at a distance of about three-fifths of a mile from his residence, and that the crew, in order to remove the wreck, had dug two 'dead man' holes, designated in the record as the north and south holes. Both were of considerable length and depth. They had served their purpose and were to be filled, and there is some conflict in the testimony whether any dirt had been thrown into the south end of the north hole the afternoon of the 18th. There is testimony, however, that when the crew went to work the morning of the 19th there were about two feet of dirt in that part of the north hole. Forte reported for work that morning and was requested by the foreman to go to another point, and assist in putting in a crossing. He objected, saying he was expecting a telegram or message and wanted to remain where he was, and at once went to work filling up the south end of the north hole, shovelling dirt rapidly. He said nothing about his wife or children at that time. He worked for half an hour or an hour, when the hole at the south end, according to the testimony of some of the witnesses, was filled level with the surface,—while

others state the dirt was about four feet deep at that point and that there was no dirt in the north end of the hole at all. Forte quit work at this time saying his wife had left him the night before, and that he wanted to go home and see about the children. He then went to the foreman and made the same statement about his wife leaving him and that he had to go and take care of the children and said he would be back in a few days. Witnesses also state that he did not receive any telegram or message while at work, and said nothing more to them on the subject. Several weeks prior to this time Forte had commenced a divorce proceeding against his wife, one object of which was to secure possession of a considerable sum of money which he claimed he had given his wife. She filed a cross-complaint in which she asked for a divorce. The proceedings were pending at the time of her disappearance, and Mrs. Olson testifies that she loaned her money on the 18th to assist her in paying the expenses of the divorce proceeding, which it was her intention to prosecute. On Friday, the 20th, Mrs. Olson, in company with Forte, visited the Forte home. She stated that she was familiar with all the wearing apparel of her daughter; that she looked over the house and found that all the wearing apparel was there, that her daughter had, which included her dresses, underclothes, shoes and hats. The same day Forte was at the home of Mrs. Olson when he accidentally dropped the ring deceased was wearing the day of her disappearance. It rolled under a table. He looked around to see if this was observed, and as quickly as possible recovered the ring and replaced it in his pocket. Two or three days later Forte was arrested for the murder of his wife, and taken to the office of the district attorney, who asked him what had become of his wife's ring. He denied having any ring, but finally drew it out of his pocket, wrapped in a handkerchief. When asked where he found it he said, under a table at his house, after his wife had gone. At another time he stated that he found the ring tied in a handker-

chief on the dresser at his house. About the middle of the week following the disappearance of deceased, Mrs. Olson again visited the Forte home, at which time she took the sheets from the bed, the under one of which had spots on it. About this date the brother and brother-in-law of deceased, at the suggestion of the foreman of the section crew, visited the holes to which we have referred, and Sunday night following again went to the north hole, and dug at the south end, with the result that at a depth of five or six feet they found the body of deceased. The body was practically nude, having on only a short jacket or waist, and a short dressing sacque. The ankles were tied with a cord, a rope made out of cotton cloth was around the neck, a cloth over the face, and one witness says the hair was done up, or was not down. The physician who examined the body testified that the hair was braided down the back, and that there was a rope around the neck, made out of cloth rolled together, the ends of which were tied with a string; that the tongue was protruding and there was a bloody serous fluid which had stained the rope; that the nose was pressed flat on the face, as if it had been held down by something, and that in his judgment it was an *ante-mortem* condition; that he examined the body for bruises and wounds, and could not find any injuries of that kind, and was of the opinion that the victim came to her death by suffocation due to strangulation by means of the use of the rope. The doctor further testified that he had examined the cloth found over the face, that it was saturated with a bloody serous fluid from the body of a human being, and of the kind that would ooze from the mucous membranes, such as the throat and nose; that it was not from an incision, but of a character which would result from pressing. He also stated that he analyzed one of the spots on the sheet taken from the bed by Mrs. Olson and obtained the same results. There was also considerable testimony introduced relating to threats made by Forte against his wife, to the effect that he had beaten and threatened to kill

her; that about two weeks prior to her death he picked up an ax, and said he had a notion to split her head with it; that at another time he said he would cut her head off, and put her in a hole, and that nobody would know anything about it, and that he frequently called her vile names. The testimony of the mother and a sister of deceased fixed her weight at about 110 or 115 pounds. The doctor stated that she might have weighed as much as 145 or 150 pounds; but at the time he viewed the body it was very much swollen.

We think this evidence, though circumstantial, was ample to justify the jury in reaching the conclusion that the accused was guilty as charged, beyond a reasonable doubt. He instituted an action against his wife for divorce, one object of which was to recover a considerable sum of money which he claimed was his, and in her possession. She had filed a cross-complaint, and on the day she disappeared was evidently intending to take steps to secure a divorce. He and deceased were quarrelling the evening of the 18th at their home. Such quarrels were of frequent occurrence. He had often threatened to take the life of his wife. At 2 A. M. the morning of the 19th he returned home, pale, dripping with perspiration, and agitated. He knew that the north hole had served its purpose, and was to be filled. He stated to Mrs. Olson that his wife had gone to a real estate office the evening of the 18th to see a real estate man. He also intimated that his wife had run away, leaving in an automobile. These statements were evidently fabrications when it is considered that all the clothing of deceased was in the house. The morning of the 19th he left the house, as he said, to secure a lay-off. Instead, he went to work at the south end of the north hole, shovelling dirt into that part of the excavation, working rapidly. At that time there was some dirt in that end of the hole, when there was none the day before,—the exact condition which would exist if he had thrown the body into that part of the hole the previous night, and covered it with dirt. He objected

to working at any other point, giving as his excuse that he expected a message. When the south end of the hole was filled, or dirt to the depth of several feet had been thrown in, he stated for the first time that his wife had left him, and that he wanted to go home and see about his children. Afterwards the body was found in the end of the hole which he assisted so vigorously to fill, and when filled to such extent as would prevent discovery of. the body by other members of the crew, left the place without saying anything about the message he expected. These acts, in connection with his objection to working at another point, would be the course he would pursue if he had murdered his wife and placed the body in the hole, the night before, and covered it with dirt sufficient to temporarily hide it from view. He had possession of his wife's ring she wore the day she disappeared. When he dropped it at the home of Mrs. Olson he appeared concerned about whether it had been noticed. When arrested he denied having the ring, but finally produced it, and made conflicting statements as to where he found it. The body, when found, was nude. None of the clothing of deceased was missing. She had been strangled. The spots upon the sheet were blood spots of a character which would ooze from the throat or nose of a person killed by strangulation. These facts and circumstances clearly point to the fact that some time after deceased arrived home on the 18th, and before Mrs. Olson arrived at the house, defendant strangled the deceased, and carried, or in some way conveyed, her body to the hole where it was afterwards found. They are consistent with defendant's guilt, and inconsistent with any reasonable hypothesis of his innocence and sufficient to justify the jury in determining that he was guilty as charged, beyond a reasonable doubt, although no eye-witness saw the crime committed.

On behalf of the defendant evidence was introduced to the effect that Bessie was seen on the street down town the evening of the 18th between 9 and 10 o'clock, and that defendant was down town that evening from 8:30 to 10:30

and was looking for his wife. Defendant testified that he was down town that evening trying to find his wife; that he thought he saw her near a picture show; that his wife told him before leaving the house that she was going to the Central Block to meet her mother; that he went there and remained about half an hour; that he afterwards visited several saloons, naming them; that later he went to a picture show; that he boarded a car about midnight, and reached home at 12:30; that his wife was not there, and he returned to the street car line, thinking she might be on the last car, and came back to his house; that Mrs. Olson was there, and on looking in the dresser he found that $75.00, a diamond pin, a ring and a watch were gone. He denied that the sheets introduced in evidence belonged to him.

It was the province of the jury to pass on the credibility of the witnesses who made these statements. They did not believe them and the record fully supports this conclusion.

It is next urged that the instructions on the question of alibi deprived the defendant of the application of the rule of reasonable doubt. The instructions on this subject must be considered as a whole and when so read it is clear the objection is not tenable. The same question was raised in the recent case of *Foster v. People,* 56 Colo. 452, 139 Pac. 10, where, in considering instructions quite similar, it was held to be without merit.

In support of the motion for a new trial the defendant presented affidavits stating that one of the jurors had expressed an opinion and belief that the defendant was guilty, prior to his examination on his *voir dire.* The questions and answers of the juror touching his qualifications were not preserved. Counsel for defendant stated in his affidavit that the juror when examined said he had not formed or expressed an opinion regarding the case or the guilt or innocence of the defendant. On the part of the people the affidavits of the district attorney, the juror, and other jurors who sat with him in this case,

were submitted, in which it was stated in substance, that the juror said he had formed and expressed an opinion which would require evidence to remove but, if accepted, he would disregard his opinion and try the case upon the merits and the instructions of the court. They further stated that counsel for plaintiff passed the juror for cause. From these statements on behalf of the prosecution it does not appear the juror was disqualified.

The court determined the question at issue in favor of the people. The affidavits on their behalf support this finding and we will not disturb it on review: *Smith v. People,* 39 Colo. 202, 88 Pac. 1072; *Johnson v. People,* 33 Colo. 224, 80 Pac. 133, 108 Am. St. 85.

The judgment of the District Court is affirmed.

*Judgment affirmed.*

Chief Justice Musser and Mr. Justice Hill concur.