## No. 12,580.

### Fleagle v. The People.

(289 Pac. 1078)

Decided June 9, 1930.   Rehearing denied June 30, 1930.

Mr. L. W. Cunningham, for plaintiff in error.

Mr. Robert E. Winbourn, Attorney General, Mr. E. J. Plunkett, Assistant, for the people.

*En Banc.*

Mr. Justice Adams delivered the opinion of the court.

This is a companion case to *Abshier v. People,* 87 Colo. 507, 289 Pac. 1081, and *Royston v. People,* 87 Colo. 529, 289 Pac. 1077. The three cases should be read together.

The defendant, Ralph Fleagle, was tried on a plea of guilty, convicted and sentenced to hang for the murder of A. N. Parrish, committed on May 23, 1928, while he and three confederates, Abshier, Royston and one Jake Fleagle, were engaged in the act of robbing the First National Bank of Lamar, Colorado, of which A. N. Parrish, deceased, was then president.

Eye-witnesses to the robbery and murder at Lamar who testified in the Abshier and Royston cases also testified here, and the evidence in the present case connects Fleagle with the crime from beginning to end, including the Colorado and Kansas incidents. Before the trial the defendant had talked freely of his connection with the crime to various persons. They repeated these conversations at the trial and the officers also obtained a voluntary confession from Fleagle.

It is unnecessary to recount the story of the crime or incidents pertaining to the capture of the bandits, except to say that Ralph was apprehended first. Abshier was under suspicion, but Ralph finally confessed and implicated his brother Jake, and Abshier and Royston as participants in the crime. Information given by Ralph led to the capture of Abshier and Royston.

There are only three matters connected with the present case to be discussed that are not covered in *Abshier v. People, supra.* The first one of these relates to an alleged agreement pertaining to the penalty to be inflicted on defendant, the second pertains to the alleged bias or prejudice of Carroll, a juror, and the third to alleged prejudicial remarks of a special prosecutor.

1. Defendant claims that he was promised by officers and the district attorney that, if he would confess, he would not suffer the death penalty, but would be given life imprisonment. Counsel for the prosecution deny that any such agreement was made, and this is the view that the trial court took of it. It is practically conceded that Ralph was promised that the district attorney would not *ask* that the death penalty be inflicted, and the record shows that the district attorney kept this promise. The district attorney even refrained from objecting to certain instructions asked by the defendant, but they were so grossly improper that the court on his own motion refused to grant them. One of them was that the jury be instructed to fix the penalty at life imprisonment. Other instructions that were refused would have bound the jury to the purported agreement, and would have deprived the jury of its power to fix the punishment. They were rightly denied.

2. The testimony on behalf of defendant was voluminous, but it had little if anything to do with the issue tendered by the plea of guilty. The information charged defendant with murder; the evidence on behalf of the people showed defendant guilty of an aggravated murder in the first degree. The defense was not that the crime had not been committed, or that the confession was involuntary, or that it was improperly obtained, but that an "agreement" or "compact" as to the penalty had been breached. Defendant called numerous witnesses to prove the "compact" and the state called others in rebuttal. Defendant's connection with the crime was spoken of only incidentally by defense witnesses, and

when mentioned by them, it was referred to only as an undisputed fact. The state interposed no objections to defendant's testimony and defendant himself took the stand, not to deny the crime or show mitigating circumstances, but only to give his version of the so-called "agreement." Defendant admitted his previous confession about his connection with the Lamar bank robbery, and said that he had given the names of his accomplices correctly and also that he had given their locations in so far as he had any information. He further said:

"I was given the promise that my father, seventy-three years old, in jail in Garden City, Kansas; and my brother, Walter, who has a family of five children, and a wife, he was in jail in Colorado Springs; and my brother, Fred Fleagle was in jail in Colorado Springs, that they would be released if they didn't take part in the Lamar robbery, or hadn't committed a murder in Kansas; and that I would be given life imprisonment."

The defendant also claims that he made his confession and pleaded guilty in reliance on the above promise by peace officers, and further that four innocent men had been charged with the crime and that this also influenced him. On cross-examination, defendant admitted that on September 28 (1929) he wrote a letter from Denver (where he was then being held) in which he said that he felt pretty good, "but that his fate was in the hands of a jury." The record shows that he pleaded guilty in open court on September 12, 1929, at which time the effect and consequences of his plea were fully explained to him, and that if found guilty of first degree murder, the jury fixes the penalty, either at life imprisonment or death. Being so informed, defendant persisted in his plea. Judge Cunningham, defendant's attorney, also knew the law and of course informed his client. The trial court was also of that opinion.

3. It is difficult for us to reconcile ourselves to a discussion of this kind in a murder case, as if it were a suit on contract, or defense thereto. If the fact that Fleagle

confessed and gave information to the officers that led to the arrest of his confederates was intended to soften the hearts of the jury toward Fleagle, nevertheless the jury was advised of his "services" by testimony that includes all of defendant's evidence, and which covers over two hundred folios in the record, on this point alone, including rebuttal by the state. The district attorney in his opening statement said that he did not ask for the death penalty, that being solely within the province of the jury, and a special prosecutor made a similar statement, whether justified or not. Testimony about the so-called "compact," admitted without objection, disclosed nothing in mitigation of the *crime*.

■ ■ 4. Jurors are constitutional officers (Colo. Const. art. 2, §23); they have their appointed functions to perform, one of which is to fix the penalty in a case of this kind submitted to them. §6665, C. L. 1921. The court cannot lawfully usurp this power, nor set aside the legislative will, and the trial court wisely refrained from doing so when requested by an erroneous instruction tendered by the defense and refused. No one may acquire a power of attorney from a jury to make a "compact" on its behalf. The argument of counsel for defendant can mean nothing under the facts here, except that the *jury* breached a "contract" made with Fleagle by a person or persons assuming to represent the jury or holding themselves out as having jury powers. This cannot be countenanced. If these practices were approved such actions of peace officers would usurp the powers of court and jury. We are satisfied that Fleagle is not the victim of a broken promise, illegal or otherwise.

■ "It is beyond the authority of this court, from a review of the record, to say the verdict should have been different when there is sufficient testimony to sustain the one returned." *Henwood v. People,* 57 Colo. 544, 573, 143 Pac. 373, Ann. Cas. 1916A, 1111. This statement may be made with even stronger emphasis here, because in the Henwood case we said that there was testimony from

which the jury might have found a different verdict, but in this cause there was no such evidence.

5. On motion for new trial, counsel for defendant produced affidavits concerning statements alleged to have been made by juror Carroll before the trial. One of the remarks attributed to him was, "Ralph Fleagle is trying to save his neck by the use of his agreement with the officers, but if I am chosen on his case I will stay in the jury room forever before I return any verdict except one of death * * * if they expect a life sentence they sure want to leave me off of that jury." Other like remarks are attributed to Carroll. Another affidavit charged Carroll with saying: "I do not consider so much the killing of Parrish and his son as I do the killing of the two men in Kansas." Another affidavit was similar to the first two. A counter affidavit by juror Carroll denies the statements attributed to him in the three affidavits above mentioned. The story of the crime was common property; Carroll, in referring to a talk he had with one Mahin, swore that he "eradicated from his mind any and all impressions which he had or might have had, however slight, with reference to the question of the punishment which should be inflicted upon Ralph E. Fleagle, and that at the time of his voir dire examination he had no opinion on that point, and that after due consideration and deliberation had decided that whatever he had heard in that case he should pay no attention to and that he did not pay any attention to any previous opinion based on the enormity of the crime as confessed by the defendant in open court—that is, murder in the first degree—and that the true meaning and intent of his answer on his voir dire examination was to that effect."

A parallel case will be found in *Baker v. People,* 72 Colo. 68, 209 Pac. 791. Baker was convicted of murder in the first degree and we sustained the judgment. On pages 77 to 79 there is a discussion of the question of a juror's alleged remarks and their effect on motion for a new trial, a reading of which we recommend as an answer

to defendant's objections. Other cases in point: *Smith v. People,* 39 Colo. 202, 207, 88 Pac. 1072; *Ausmus v. People,* 47 Colo. 167, 197, 107 Pac. 204, 19 Ann. Cas. 491; *Forte v. People,* 57 Colo. 450, 457, 140 Pac. 789; *McGonigal v. People,* 74 Colo. 270, 272, 220 Pac. 1003; *Shank v. People,* 79 Colo. 576, 581, 247 Pac. 559.

After the argument of the motion for a new trial the court said: "In regard to the juror, Carroll, I think his affidavit fully and completely explains his attitude of mind in the case, when he was selected as a juror; and I think it fully shows that he was a competent juror at that time."

Section 5883, C. L. 1921, reads: "No person summoned as a juror in a criminal case shall be disqualified to serve as such by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused; Provided, The court shall be satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict, according to the law and the evidence submitted to the jury in the trial of such cause."

The matter of the guilt or innocence of the accused is not an open question here; it has been foreclosed by the plea of guilty and proof of the crime, but we have employed the above section by analogy as applying to the juror's attitude toward circumstances in mitigation or aggravation. We cannot forget, however, that defendant failed to show a single mitigating circumstance. *People v. Abshier, supra.*

6. It is well to bear in mind some of the limitations on the word "prejudice" in its present application. A general prejudice against crime, or prejudice against the particular crime with which the accused stands charged does not disqualify a juror. Thompson on Trials (2d Ed.), Vol. 1, §73. A juror's respect for the laws of the land should commend him to the confidence of the court. As said in *Baker v. People, supra* (page 78 of the opinion): "The killing is admitted. The

circumstances attending the homicide were such as to provoke comment, and it would tend to obstruct the administration of justice, with little benefit to persons accused of crime, to hold that the making of remarks derogatory to a defendant would disqualify one to act as juror.''

■ That the court was satisfied that Juror Carroll could lay aside any previous determination, if any, as to the punishment to be meted, is settled by its ruling, and we shall not disturb it. And, under the authorities in this state, if the juror had been conscientiously opposed to the death penalty, he would have been subject to challenge for cause. *Shank v. People, supra; Hillen v. People,* 59 Colo. 280, 149 Pac. 250.

■ 7. Objection is made on account of remarks addressed to the jury in the argument of a special prosecutor, that they were too severe. It is impossible for us to think of any language that could have been used stronger than the evidence itself. Some of the evidence here, about Kessinger's pitiful plea for his life on account of his wife and baby and the robbers' cold disdain of his plea, is even more heart-rending than the story as related in the Abshier case. Defendant's counsel's chief objection was that the special prosecutor disregarded the ''compact'' by asking for the death penalty ''by innuendo.'' This is an unusual objection in a prosecution for first degree murder, perpetrated admittedly under most atrocious circumstances. Even if the objection were meritorious, and we do not say that it is, still, the court at the request of counsel for defendant directed the jury to disregard such remarks. The prosecution did not ask for the death penalty, but the evidence urged it.

8. Childress, one of the witnesses, testified that Ralph told him of the frequent visits of the robbers to Lamar and looking over the roads in preparation for the robbery; Ralph said he used to sit in front of the Ben-Mar hotel across the street watching the bank. On being asked why they kidnapped two men from the bank, de-

fendant said that there was always some damned fool
that thought he knew more than he did himself; he wanted
to take only one, "but the boys wanted to take two, and
they took two;" that they had originally intended to take
Jaddo (Parrish junior), for the reason that Mr. Parrish
would prevent a pursuit, or firing at the car. But after
Jaddo was killed they couldn't take him, so they took
two other men instead. It is also apparent from the
evidence that the robbers did not release Lundgren
through sympathy, but in order to put him out on the
road at a place where it would throw pursuers off the
track.

The witness, Childress, further said: "He [Ralph]
stated the proceeds of the robbery were to be divided, 50
per cent to himself and Jake, to pay the expenses, etc.,
of engineering the job; he said it was, there was a good
deal of time and expense involved in planning a job like
this; and the remaining 50 per cent would be divided
equally among the participants in the robbery."

Fleagle was a Fagin in crime. The testimony shows
that more than once he referred to Abshier and Royston
as "students" in connection with this matter. It has
been severally decreed by two juries that these "stu-
dents" schooled in this crime at the so-called "horse
ranch" in Kansas, shall suffer the death penalty, but it
is urged that leniency should be extended to Fleagle, their
preceptor and master. We are asked to reverse the judg-
ment of the court which would involve the setting aside
and holding for naught the verdict of the only body of
men that has a right to fix the punishment. It would be
a grave abuse of discretion to grant a new trial in this
case.

The judgment of the district court is affirmed, and it
is further ordered that said judgment be executed dur-
ing the week ending July 12, 1930.