No. 12,558.

ABSHIER *v.* THE PEOPLE.
(289 Pac. 1081)

Decided June 9, 1930. Rehearing denied June 30, 1930.

Mr. Byron G. Rogers, Mr. Frank C. Bryant, for plaintiff in error.

Mr. Robert E. Winbourn, Attorney General, Mr. E. J. Plunkett, Assistant, for the people.

*En Banc.*

Mr. Justice Adams delivered the opinion of the court.

The defendant George J. Abshier, alias Bill Messick, was tried and convicted of the murder of A. N. Parrish, committed on May 23, 1928, and sentenced to hang. The crime was committed while defendant and three confederates, Howard L. Royston (also known as "Heavy"), with Ralph Fleagle and Jake Fleagle, were all engaged in the act of robbing the First National Bank of Lamar, in Prowers county, Colorado. Parrish was president of the bank at the time that he was killed.

There is no dispute about any material question of fact. The defendant pleaded guilty; the jury so found and fixed the punishment at death. All elements of the crime were proven by the state; the defendant made a voluntary written confession to officers before the trial, and the confession was admitted in evidence without objection by defendant, except as to certain features connected with the flight of the accused. Defendant also voluntarily took the witness stand in his own behalf and repeated his story of the crime, substantially as contained in his previous confession. Defendant's counsel also called as a witness, "Heavy" Royston, one of the participants in the robbery and murder. Royston's testimony corroborated that of defendant in all essential particulars as to the matters concerning which he testified. On the above evidence a jury of twelve found the defendant guilty and fixed the punishment at death.

Some of the details of the robbery, homicide and flight which were not told by certain witnesses were vividly related by others. Their testimony all formed a connected story, and none of it was denied in any material particular. In some respects, the most accusing part of the recital which follows comes from the lips of Abshier and Royston, corroborated by witnesses for the prosecution. Fred Fleagle, a brother of Ralph and Jake, contributed an important section of the testimony. Ralph Fleagle did not testify in the case here under review and Jake was not present at the trial. It does not appear from the record that he has been apprehended. Survivors of the robbery and bloodshed at the bank, eye-witnesses to the crime, testified to the happenings there, and Kansas and Colorado witnesses described subsequent events.

The robbery had been planned long in advance. Defendant and his companions had a rendezvous near Marienthal, in the state of Kansas, on a ranch known as the "horse ranch," rented and occupied by Fred Fleagle, who described its location and related actions of Abshier, Royston and Ralph and Jake Fleagle before and after the shooting of Parrish. Details of the proposed robbery were planned by the defendant and his confederates at the Kansas ranch. Defendant said that Jake had been figuring on robbing the bank for seven or eight years; that Jake spoke to defendant about it first in the fall of the year 1927; that defendant, Jake and Ralph, had discussed the proposed holdup for some four or five months before it occurred; that Ralph put in several months looking over the roads, and that defendant had been over the roads several times before the robbery; that they had been at Lamar several times before, "looking over the situation, sizing up the bank" * * * its "possibilities" and "how defended;" that they had come prepared to commit the robbery on most of these occasions, but that they decided that the job "was too tough for three men," and that Jake or Ralph "propositioned" Royston, who

accepted and later joined the other criminals at the horse ranch and participated with them in their deeds of violence that followed. According to defendant, Royston accompanied the other three participants on some of their scouting expeditions.

At about three o'clock in the morning of May 23, 1928, Jake, Ralph, "Heavy" Royston and "Bill" (the defendant) left the horse ranch in western Kansas by automobile, headed for Lamar. They had Kansas, California, Oklahoma and Colorado automobile license plates. The Colorado license plates were obtained especially for the bank job, and the different plates were provided for the purpose of throwing the officers off the track. The four men arrived at Lamar about nine o'clock in the morning of May 23, and spent the forenoon in that city making observations. They agreed that it was best to wait until "everybody" (meaning those connected with the bank) was inside. Apparently satisfied, at about one o'clock in the afternoon of the same day, the four, all armed with deadly weapons, entered the bank for the purpose of robbing it. Parrish was talking to a customer; there were other customers present, and employes were engaged in the transaction of their duties. E. A. Lundgren, a teller, testified that he heard a command, "Hands up!" and "You sons-a-bitches get them all up!" and that he heard another command from the lobby, "Get that old son-of-a-bitch in there." Garrett, assistant cashier of the bank, gave similar testimony, and other witnesses corroborated it. These obscene words of assumed authority came from the robber outfit. According to the defendant's confession, the last quoted remark was uttered by Ralph Fleagle, after the first shot was fired, and then (said defendant), "That is when this shooting commenced, shortly after." Garrett also testified that he heard calls from the marauders, such as, "Get those rifles," "Get those liberty bonds," and "Get up, we will take you, too."

The bandits had previously planned their several sta-

tions, had arranged the part that each was to take in the robbery, and each of them actively participated in its consummation. Defendant admits that the details had been discussed and arranged between the desperadoes a good many times. Without attempting to relate all of the particulars of the crime, it is shown by the evidence that the defendant grabbed and struggled with a bank customer, and Royston with another. Abshier said in his confession, "I grabs hold of the man standing alongside of me, shoved him to the floor; told him to get down. I called in this window for people to lay down behind; I wanted them to get out of the way of the bullet. I also lay down myself, for an instant or two. And when I raised up the main part of the shooting was over at that time; it all took place very quickly." E. A. Lundgren, who was then a teller on duty at the bank, says he heard a command, "Get down, you sons-a-bitches." Lundgren, Garrett, his wife (Myrtle Garrett), and Miss Potter, all bank employes, and perhaps others, were compelled by the robbers to lie down on the floor. Another incident related by the defendant in his testimony is that at the command of Jake, he (defendant) returned to the bandits' automobile, brought back two rifles and gave one to Jake. Defendant says that this was shortly before they left the bank. Defendant retained the other rifle.

Many shots were fired by the brigands. After they had begun the fusillade, A. N. Parrish, the bank president, seized his gun and shot Royston in the jaw, severely wounding him. Later during the havoc, one of the robbers shot and killed A. N. Parrish, and one of them shot and killed J. F. Parrish, another officer of the bank and son of the president. Each bandit had brought a pillow slip with him, in which to carry away the plunder. They stole from the bank the sum of $10,664 in money, $12,400 in liberty bonds, and $196,500 in commercial bonds, a total of $219,564. Defendant says that they later sorted out the loot and that he burned it all except the cash and liberty bonds; that they later disposed of the

liberty bonds; that the original arrangement between the band was that defendant was to get 10 per cent of the gross proceeds, at no expense to himself, but that unforeseen matters arose and that he actually got about $2,100 as his share of the crime and paid his own expenses.

When Ralph, Jake, "Heavy" Royston and "Bill" (the defendant) fled from the bank with their booty, they kidnapped Lundgren and another bank teller by the name of Kessinger. The admitted purpose of the robbers in taking Lundgren and Kessinger with them was to protect themselves in case of pursuit. Defendant says that they intended to take one bank employe for "protection" but for some reason they took two. The four bandits hurried to their waiting automobile and made off with their prisoners and spoils. Lundgren has but one arm, and his captors released him a short distance from the city of Lamar. Lundgren testified that Kessinger "told them he had a wife and baby, and he kind of cried, and wanted to be let out." They refused and took Kessinger with them.

The fleeing bandits were pursued and overtaken by L. E. Alderman, the sheriff of Prowers county, and another citizen, but the four gave battle and escaped with Kessinger, their remaining prisoner. They arrived at the "horse ranch" in Kansas the same night. They bound and blindfolded Kessinger, and defendant said, "We decided we had better get rid of Kessinger." The defendant with Jake and Ralph (according to defendant) at a later time took Kessinger to a shack, and Ralph shot him in the body, shot him several times after he fell and killed him. Kessinger's decomposed body was found afterwards.

Royston's wounds were painful, and needed medical attention. The other three, Jake, Ralph and Bill (the defendant) therefore decoyed Dr. Weinenger, a physician and surgeon of Dighton, Kansas, from his home at night, on the pretext that there was a boy with a foot crushed by a tractor. The doctor quickly responded to

their call of distress, left his home in his automobile and was directed by the trio back to the "horse ranch," where he gave medical aid to Royston and dressed his wound. Thereafter, when the gang was through with the physician, they bound and blindfolded him, took him out, shot him in the back of the head with a shotgun, threw his dead body over a cliff, and shoved his car down a gully. Defendant was present and claims that Jake did this shooting. The doctor's blood and brains were later found spattered on the ground and his body was recovered. The sheriff of Prowers county testified among other things as to statements made by defendant identifying the different weapons owned by the four bandits. The testimony is undenied. Defendant claims that he did not actually fire any shot. He said that during the ride from the bank back to Kansas, Jake declared that he (Jake) got the old man (meaning A. N. Parrish).

The four outlaws fled from Kansas to various parts of the country and later separated. The liberty bonds, or some of them, were sold in California where defendant got his final division of the cash proceeds of the robbery. Ralph Fleagle, Royston and the defendant Abshier, alias Bill Messick, were finally captured. Abshier, Royston and Ralph Fleagle were separately tried in the order named and sentenced to death. They have severally brought their cases to this court to review the judgments and we have decided them concurrently. *Royston v. People,* 87 Colo. 529, 289 Pac. 1077, and *Fleagle v. People,* 87 Colo. 532, 289 Pac. 1078.

The statement of facts above set forth has been taken solely from the record in the Abshier case, the one now under consideration. We have felt obliged to relate the shuddering tale and have dwelt with some particularity on incidents connected with the crime, in view of the gravity of the offense, the extreme penalty imposed, and the final effort of defendant's attorney to undo the judgment. The recital of the facts is not intended as a demonstration of the justice of the verdict of guilty of murder

in the first degree, for defendant admits his guilt, and the evidence fully establishes it. Our recounting of the awful deed has been made necessary in the consideration of the grade of the penalty for first degree murder, whether life imprisonment or death, by reason of so-called "mitigating circumstances," of which counsel for defendant speaks in general terms, or, on the other hand, of their antitheses, *aggravating* circumstances, which the state proved and which defendant admitted, but concerning which defense counsel has been forced to say little or nothing.

We should be disposed to stop at this point and affirm the judgment except that defendant's counsel, while freely admitting and not seeking to justify defendant's deep guilt, nevertheless strenuously argues that the rules of criminal procedure were violated and that defendant was not accorded a fair and impartial trial, to which even a guilty man is entitled. This challenge to the administration of justice, whether well founded or not, demands our fullest consideration.

Counsel for defendant has grouped the assignments of error in his opening brief under separate headings. We have rearranged them, but have covered them all in the discussion that follows. As nearly as possible, they are in the chronological order of the trial proceedings. They relate to (1) the crime of which defendant was convicted and the gist of the defense; (2) refusal of trial court to grant continuance of two weeks instead of six days allowed; (3) refusal to change place of trial for alleged prejudice of inhabitants; (4) alleged bias or prejudice of jurors; (5) refusal to permit defendant to change plea of guilty to not guilty; (6) admission of evidence of other crimes connected with the crime charged; (7) evidence in mitigation or aggravation of offense; (8) instructions to jury; (9) time for presenting motion for new trial, and denial of motion when presented; (10) technicalities—multiplicity of objections or assignments of error; and (11) fair and impartial trial.

1. The crime of which defendant was convicted is defined in section 6665, C. L. 1921, which reads in part as follows: "* * * All murder * * * which is committed in the perpetration or attempt to perpetrate any * * * robbery * * * shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree. The jury before which any person indicted for murder shall be tried, shall, if it find such person guilty thereof, designate by its verdict whether it be murder of the first or second degree, and if murder of the first degree, the jury shall in its verdict fix the penalty to be suffered by the person so convicted, either at imprisonment for life at hard labor in the penitentiary, or at death; and the court shall thereupon give sentence accordingly * * *."

The gist of the defense of the accused, in so far as it may be called a defense, is contained in the terse re-direct examination by one of his counsel (folio 1286), as follows:

"Mr. Rogers: Mr. Abshier, who planned all of this robbery? A. Ralph and Jake. Q. After you had returned to the ranch, who gave all of the orders out there? A. Ralph. Mr. Rogers: That will be all. (Witness excused.)" In other places defendant dwells on the leadership of Ralph and Jake and of defendant's claim that he did not fire any shot.

 Even if defendant's statements are true, they do not excuse him. This feature is correctly covered in the latter part of instruction No. 6 as given by the court, as follows: "If the homicide in question was committed by one of his [defendant's] associates engaged in the robbery in furtherance of the common purpose to rob, he is as accountable as though his own hand had intentionally and actually given [fired] the fatal blow [shot] and is guilty of murder in the first degree."

2. Continuance. When the defendant was arraigned and pleaded guilty, he was represented by Mr. W. L. Cunningham, a lawyer of long experience at the bar, for-

merly a district judge and at another time a judge of the then existing Court of Appeals of this state. When the case was called for trial, for some reason Judge Cunningham did not feel that he could represent defendant, and was permitted to withdraw his appearance. To the end that no one accused of crime, however poor or friendless, may be unprotected, section 7117, C. L. 1921, provides that the court may assign counsel for indigent defendants in criminal cases, and directs the allowance of an attorney's fee at the expense of the county. On defendant's showing of inability to employ counsel, the trial court appointed attorneys Rogers and Bryant to represent defendant. They have since so acted.

Defendant then moved for a continuance of two weeks to prepare his defense. The court refused, but granted a continuance of six days. Error is assigned on the ground of the refusal of the court to grant the full time that was requested. The matter of a continuance for trial rests in the sound discretion of the court and its action will not be set aside unless the action was plainly erroneous and unjust. *Davis v. People,* 77 Colo. 546, 238 Pac. 25; *Griffin v. People,* 76 Colo. 422, 231 Pac. 1113; *Daugherty v. People,* 78 Colo. 43, 45, 239 Pac. 14; *Stone v. People,* 71 Colo. 162, 204 Pac. 897; *Epley v. People,* 51 Colo. 501, 503, 119 Pac. 153; *Byers v. McPhee,* 4 Colo. 204.

3. It is stated in the Epley case, supra, that the gravity of the offense charged may be an element of determination in granting or refusing a continuance. The possibility that a trial earlier than the date requested might result in the unjust punishment of an innocent man should, and would, no doubt, give pause to any humane judge, but the gravity of the crime is not the sole standard of determination. If it were, an outlaw could rest assured that the greater the enormity of his offense, the longer time he would have to evade its consequences. Circumstances may be well imagined, due to the absence of material witnesses or other cause, that a longer time

518

might be required for the preparation for trial of a minor infraction of the law, than for a major one. In *Davis v. People, supra,* we discountenanced delays without cause in murder trials, as detrimental to the administration of justice. The additional time desired in that case was longer than here, but the principle announced is the same. In the instant case, however serious the grounds for continuance may have appeared when the motion for continuance was presented to the trial court, subsequent developments justify its ruling. At the end of defendant's allotted six days, no doubt after consultation with his present attorneys, he apparently decided to continue his policy to make a clean breast of the sordid affair, confess his guilt and call no witnesses except his confederate Royston, then incarcerated in jail at Lamar, awaiting trial for the same offense.

The truth of defendant's extrajudicial confession and subsequent like admission on the witness stand is conclusively borne out not only by the combined testimony of nineteen witnesses for the state, but also by his own witness, Royston. Following are excerpts from the latter's testimony: Direct examination by Mr. Rogers: "Q. Mr. Royston, did you go, in company with Ralph Fleagle, and Jake Fleagle, and this defendant, George J. Abshier, into the First National Bank on the 23rd day of May, 1928? A. I did. Q. Was Mr.—where was Mr. Abshier at the time you entered the bank? A. He walked in with me." The witness then told about where Abshier stood in the bank.

On cross-examination by Mr. Erickson, district attorney: "What were you doing in the First National Bank on the 23rd day of May, 1928?" "Mr. Rogers: He admits he went in to stick it up." (Colloquy and question repeated.) Answer by the witness: "Holding it up. Q. That was the object of the four of you going into the bank? A. It was. Q. To get the money? A. Yes. Q. All four of you were armed? A. Yes * * * Q. And to impress the people in the bank with the fact that you

meant business? A. Yes." The witness described how Parrish shot him, and other scenes of the robbery; that the witness had a sack in his hand, that Jake said, "* * * let's get out of here, * * *" and he (they) left.

At an afternoon session, counsel for defense recalled Royston, who then testified that he saw Jake Fleagle shoot through the president's office. Royston was further questioned by Mr. Rogers and answered as follows: "What did Jake do, after he shot through the office there? A. He opened the door leading into the office, and I believe I heard him say, that I got the old son-of-a-bitch. Q. Did he say anything about it later? Q. Oh, on the way back to the ranch he said he had got the old man; various times after that he said he got the old man, made that statement." "Mr. Rogers: That is all."

We think the six days' continuance was ample time to elicit testimony of this character. Prior to the application for continuance, defendant had confessed his guilt; it is not claimed that there were any absent witnesses, and further evidence like that given could only have added to its horror. In a plain case such as this, as said in *Byers v. McPhee, supra,* the discretion of the trial court as to the advisability of a continuance "has no office to perform, and its exercise is limited to doubtful cases where an impartial mind hesitates." Pages 207, 208 of opinion.

The only other witness called by the defense was L. E. Alderman, sheriff of Prowers county, to show that informations had been filed against the four outlaws. That fact is admitted, but is immaterial.

The effect of the refusal may be summarized in the following language of Mr. Justice Sheafor in *Griffin v. People, supra,* at page 423 of the opinion: "It does not appear from the record that any prejudice or injury resulted to defendant by reason of the denial of the continuance. It does appear that defendant was ably defended, his rights fully protected, and that in all respects

he had a fair trial. The witnesses defendant desired were in attendance and testified. The court did not abuse its discretion in refusing the continuance."

Counsel for defendant think that, if more time for preparation had been given them, they could have obtained more affidavits of alleged prejudice in Prowers county. However, on defendant's own showing, the affidavits on his behalf clearly indicate that he had exhausted his resources in that respect, whatever the reasons for failure to get more may have been, even if it were allowable to grant him more time for the purpose. The following statement from *Powers v. People,* 53 Colo. 43, 45, 123 Pac. 642, is applicable: "A defendant should always be afforded a reasonable opportunity to prepare for trial * * * It affirmatively appears, however, that, notwithstanding the celerity with which the prosecution was pushed, after the information was filed under which defendant was tried and convicted, it did not prejudice his rights." It does not appear from the record before us that any further time for preparation would have affected the result.

4. Defendant moved for change of place of trial on the alleged ground of prejudice of the inhabitants of Prowers county, supported by three affidavits; there were nine to the contrary on behalf of the people. The court overruled the motion.

The granting or refusal of a motion for change of place of trial is one of the many matters wisely lodged in the discretion of the trial court, and in the absence of abuse, the order will not be disturbed. *Daugherty v. People,* 78 Colo. 43, 45, 239 Pac. 14; *Wilder v. People,* 86 Colo. 35, 42, 278 Pac. 594; *Giacomozzi v. People,* 72 Colo. 13, 209 Pac. 798; *Turley v. People,* 73 Colo. 518, 524, 216 Pac. 536. No abuse of discretion appears here.

The fact that the deceased was a banker and citizen of high standing in the community, is not in itself a ground for change of venue. That he was such is admitted, but we accept the judgment of the trial court,

indicated by its ruling, that the high esteem in which the citizens held the deceased, or any other matter, did not serve to prevent defendant from having a fair and impartial trial. Defendant's counsel produced numerous newspaper clippings from papers published in the cities of Denver, Pueblo, Colorado Springs and Lamar, all denunciatory of the crime, as well they might be. That they did not falsely accuse defendant of complicity in the robbery and murder, is now an old story. It might be said that the articles published outside of Prowers county were even more vehement than those inside the county, and if defendant should be permitted a trial where the news of the crime had not spread, he would doubtless have to go free. It does not appear from the voir dire examination of any juror who served, or otherwise, that his mind was inflamed or biased by the newspaper articles. The truth of the printed stories was verified in substance by defendant's own story of the crime, which he has never denied, and we consider the objection the effect of which is that the newspapers told the truth to be destitute of merit.

5. Alleged Bias or Prejudice of Jurors. Counsel for defendant cite J. N. Hughes, one of the jurors, as an illustration of the alleged violent prejudice existing against defendant. Counsel for defendant did not challenge this juror for cause, but we overlook this technical omission in this case and decide the matter on its merits. Hughes testified on his voir dire examination, among other things, that he was in the dry cleaning business at Lamar, had been so engaged for about fifteen years, had come to Lamar about twenty-two years ago, had been at the bank after the robbery, had discussed it with his friends and they had expressed an opinion as to punishment, but that it made no impression on his mind, had not arrived at any opinion as to what punishment the defendant should have, his mind was free and open; he had talked about the matter, but had not made a business of it, only when the matter came up; had read the

newspapers, had not arrived at any conclusion as to the punishment; that if selected as a juror, he could lay aside the things that he had discussed with his friends, that he had read in the newspapers, and not let the matter be considered at all; and on taking an oath he would absolutely set them aside and not let them interfere with him in any manner; that he had no conscientious scruples against the infliction of the death penalty.

Defense counsel no doubt selected juror Hughes as a flagrant illustration of supposed prejudice, but it refutes his argument. The acceptance of this juror indicates the satisfaction of the court of the juror's qualifications, referred to in section 5883, C. L. 1921. In the case of *Fleagle v. People, supra,* we further discuss the subject of juror's qualifications, and it applies here also.

6. Refusal to Allow Change of Plea. When the prisoner was arraigned he pleaded guilty to the information. In accordance with section 7095, C. L. 1921, the court fully explained to the accused the consequences of entering such plea, after which the accused persisted in pleading guilty. The plea was thereupon entered. This was the explanation made by the court to the defendant:

"The Court: It becomes the duty of the court to inform you that under your plea in this case, it will be the duty of the court to empanel a jury in the case, and the jury are to determine whether this is first or second degree murder; and, if first degree murder they will fix the penalty, either at imprisonment for life in the penitentiary, or at death. If it is second degree murder, the penalty will be from ten years to life imprisonment in the penitentiary. Knowing that those penalties may be imposed, do you still wish to plead guilty?"

"The Defendant: Yes, sir."

After Judge Cunningham had withdrawn as counsel for the accused, his present attorneys asked leave to withdraw the plea of guilty, and substitute a plea of not guilty, which the court refused. Error is assigned on such refusal.

The motion to change the plea was heard on October 7, 1929. At that time, the court had before it many affidavits that had been filed in the case. Among them were those of Allyn Cole, deputy district attorney, and Alderman, the sheriff, both of whom swore that they had talked with the prisoner and that he had freely admitted his guilt; that he made detailed confessions to affiants and others of his participation in the crime, and said that he pleaded guilty because in fact he was guilty. Alderman also swore that defendant said he pleaded guilty because of the accumulated evidence and in the hope of getting a lighter punishment. The verified answer of the deputy district attorney in resistance to the motion for change of venue, then on file, also said ''that various newspaper articles purporting to contain alleged confessions of the defendant and others implicated in said crime were in fact given to the public press and the reporters and others by the defendant himself freely and of his own volition, without threats or promises and for the purpose of publication or whatever use the recipients of said confessions desired to make of them.'' Abshier's affidavit did not contradict any of these sworn statements by the sheriff or the deputy district attorney.

September 12, 1929, was the date when the prisoner was arraigned, and the court fully explained the effect and consequences of the plea, and being so advised, defendant persisted therein. On October 7, 1929, this fact, and also the above affidavits were before the court when it refused defendant permission to change his plea. They were overwhelmingly against defendant.

An application to change a plea is addressed to the sound discretion of the court. Its ruling will be reversed only for abuse of that discretion resulting in prejudice. No such abuse is disclosed by this record, and subsequent evidence, which must have been approximately the same whatever the plea, conclusively answers every claim of resulting prejudice.

The general rule, sufficient for all purposes here, is

stated in 16 C. J., p. 396, §728, under "Criminal Law," as follows: "In the absence of statute, or of peculiar circumstances, a defendant in a criminal case is not entitled as a matter of right to withdraw a plea duly made to an indictment or information, in order that he may file another plea or interpose objections to the proceedings which should have been presented before the plea; the matter is within the sound discretion of the trial court. Where it is plain that substantial justice will not be promoted, or the substantial rights of defendant prejudiced, the application for leave to withdraw the plea should be denied. At the same time this discretion should be exercised liberally in favor of life and liberty."

The action of the trial court in refusing a change of plea will not be reversed if there is no abuse of discretion. *People v. Stamatides*, 297 Ill. 582, 591, 131 N. E. 137; *People v. Kleist*, 311 Ill. 179, 142 N. E. 486; *People v. Murphy*, 62 Cal. App. 709, 711, 217 Pac. 810.

7. Evidence of other crimes committed in Kansas was admissible. Such other offenses were indivisibly connected with, incidental to, and in furtherance of the plans of defendant and his confederates to rob the bank at Lamar, flee, conceal the evidence of their robbery and murder of Parrish, and escape pursuit. These acts were all a part of a single transaction, an account of which could not be well related without the whole story appearing. As such, they were admissible. See also, to same effect, Elliott on Evidence, vol. 4, §2720; Underhill's Criminal Evidence (3d Ed.), p. 194, §152, and §501, p. 712; *Commonwealth v. Sturtivant*, 117 Mass. 122, 19 Am. Rep. 401; *Goersen v. Commonwealth*, 99 Pa. St. 388; *Ingram v. State*, 39 Ala. 247, 252, 253, 84 Am. Dec. 782: "Where relevant evidence is offered it is admissible notwithstanding it may disclose another indictable offense." *People v. Spaulding*, 309 Ill. 292, 304, 141 N. E. 196. See other illustrations of the rule followed: 10 R. C. L. under "Evidence," p. 982, §164; *Garcia v. People*, 59 Colo. 434,

438, 439, 149 Pac. 614; *People v. Sampsell* (Cal.), 286 Pac. 434, 437.

"Any evidence, oral or visual, disclosing the facts and circumstances surrounding the commission of a crime is admissible. The fact that such evidence shows that the offense was particularly atrocious and might arouse the righteous indignation of the jurors does not render the same inadmissible." *King v. People,* 87 Colo. 11, 285 Pac. 157, 161.

We are limiting ourselves in the rules here stated to their application to present facts. Counsel for defendant give only a part of the reasons for the rule of admission of other crimes, some of such reasons being for the purpose of showing malice, motive and intent, and argue that, these things having been admitted, a fortiori, evidence thereof was inadmissible. But the evidence is still under the rule that it was a part of the same transaction.

 Such evidence, having otherwise satisfied the test as to its admissibility, was also relevant to show an aggravated crime, or in mitigation, if there had been any such circumstances. When the law gives the court a discretion as to the punishment, in pronouncing sentence it will look into any evidence proper to influence a judicious magistrate to make it heavier or lighter; or such evidence may be delivered to the jury at the trial if the assessment of the penalty is vested in the jury.

██ 8. Mitigating Circumstances. Counsel for defendant have repeatedly misemployed language, unintentionally, no doubt, in saying that defendant was not allowed to prove mitigating circumstances. No one attempted to stop him. The reason he did not prove them is because there were none to prove. Section 6681, C. L. 1921, reads: "The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to man-

slaughter, or that the accused was justified or excused in committing the homicide.''

All elements of the murder were proven beyond a reasonable doubt, the crime is not denied, and, since no mitigating circumstances were proven, the presumption is that there were none.

Mitigation or Aggravation. Counsel for defendant say, on page 35 of their opening brief, ''We do contend that his (Abshier's) action in the bank in not killing any person is a circumstance which can be presented to a fair and impartial jury for their consideration. In other words, it is a mitigating circumstance that a jury should consider.'' We answer that the jury has already considered it, for what it is worth, also, no doubt, the fact that defendant went out of the bank during the robbery, got two rifles, came back, kept one of them and gave the other to Jake. Also the heartless Kessinger and Dr. Weinenger incidents. Defendant's sinister presence and aid is prominently identified with every scene of the crime, from the beginning until he got his share of the spoils. In response to a question put by one of the justices at the oral argument, one of defendant's attorneys remarked on the fact that defendant told the people to lie down on the floor, to get out of the way of bullets, as indicating a mitigating circumstance. That evidence is also in the record, with the obscene words with which the command was given. It may possibly tend to show that defendant did not take or help to take any more lives than the stern requirements of the business of bank robbery seemed to demand—*only four*.

9. Error is assigned for failure to give the following requested instruction: ''The court instructs the jury that if you arrive at a verdict of first degree murder, then it becomes your duty to determine whether the punishment shall be by life imprisonment in the penitentiary, or at death; and that in determining the extent of the penalty then you have a right to take into consideration all of the circumstances of the case, and consider

those circumstances, and exercise your discretion in the matter, in determining the punishment.''

Instruction No. 5, as given, reads as follows: ''You are further instructed that if you should find by your verdict that the defendant is guilty of murder in the first degree, you shall in your verdict fix the penalty to be suffered by the defendant, either at imprisonment for life at hard labor in the penitentiary, or at death; the punishment in this event being a matter for your determination and not for the determination of the court.''

The substance of the first part of the requested instruction was contained in the instruction as given. Hence, the refusal of that part was not error. *Henwood v. People,* 57 Colo. 544, 573, 143 Pac. 373; Ann. Cas. 1916A, 1111; *Campbell v. People,* 55 Colo. 302, 309, 133 Pac. 1043; *Whalen v. People,* 74 Colo. 417, 423, 222 Pac. 398; *Goodfellow v. People,* 75 Colo. 243, 247, 224 Pac. 1051; *Brindisi v. People,* 76 Colo. 244, 254, 255, 230 Pac. 797; *Strong v. People,* 80 Colo. 284, 292, 250 Pac. 857.

As to the second part of the requested instruction refused by the court, that the jury had a right to take into consideration all of the circumstances of the case, we are at a loss to understand why counsel for defendant asked it. All of such circumstances were in aggravation of the offense, none in mitigation. ''If the court erred in this particular [refusal to give the instruction], that error was in favor of defendants, not against them.'' *Whalen v. People, supra,* at page 423. A party cannot complain when an instruction given is more favorable than the one refused. *Tashima v. People,* 58 Colo. 98, 102, 144 Pac. 200. And in fact, the jury did, as it should, consider all surrounding circumstances presented by the evidence, as the verdict shows. We have gone out of our way in this case to search the transcript in a vain quest for mitigating circumstances; we would willingly set them forth if they were there, but to recount aggravating facts would mean only a repetition of the story of the bestial deed, from beginning to end.

528

■ 10. Motion for New Trial—Refusal. Counsel for defendant complain of the short time allowed within which to file a motion for new trial. The verdict was returned on October 11, 1929, and defendant was given until October 17 within which to file the motion. Due perhaps to their engagements in the Royston case, supra, the time was extended until October 19. Counsel asked for more time, which was refused. Under our rule 8, it was within the discretion of the trial court to grant or refuse leave to file the motion at all. *May v. People,* 77 Colo. 432, 236 Pac. 1022.

■ "The fact that the trial judge refused to set aside the verdict and grant a new trial indicates that his reason and conscience approved the verdict." *Bowen v. People,* 87 Colo. 38, 284 Pac. 779, 780, citing *Piel v. People,* 52 Colo. 1, 119 Pac. 687; *Lowe v. People,* 76 Colo. 603, 234 Pac. 169.

■ 11. Technicalities. If counsel for defendant have failed to observe any technical requirement of practice or procedure, we have overlooked it in this case. As supposedly indicating prejudice on the part of the trial court, defense counsel remark on the large number of their requests that were denied and objections overruled, but their quality, not quantity, is the criterion. A plethora of captious objections or assignments of error is regarded as a vice in legal procedure, rather than a virtue. *Wilder v. People, supra; King v. People, supra.*

12. Fair and Impartial Trial. It is to the lasting credit of the law that a defendant without funds and accused of crime has had the solemn and dispassionate consideration of all before whom he has been forced to appear. The indigent defendant has received this full consideration at the hands of the jury of twelve men summoned for duty from the county at large, as well as from the trial court and this court, to the fullest extent that he would have had if he had been possessed of unlimited means for the employment of counsel. The fact that every conceivable defense has been put to the test and

found wanting strengthens our conviction that defendant has had a fair and impartial trial and that the judgment pronounced is just.

The judgment of the district court is affirmed, and it is further ordered that said judgment be executed during the week ending July 19, 1930.