JAMES A. MARSHALL, Administrator of the Estate of CHARLES E. MARSHALL, Deceased.

*v.*

THE CHICAGO & GREAT EASTERN RAILWAY COMPANY *et al.*

1. EVIDENCE—*dying declarations—in civil actions—not admissible.* In actions to recover damages for the death of a person, occasioned by the negligence of a railroad company, the dying declarations of the person killed, are not admissible in evidence to charge the defendant.   Such declarations are not admissible in any civil case.

2. SAME—*in what cases admissible.* This court is not inclined to admit in evidence the dying declarations of the person killed, except in cases of public prosecution for a felonious homicide.

APPEAL from the Superior Court of Chicago.

The opinion states the case.

Mr. E. WALKER, for the appellant.

Messrs. HERVEY, ANTHONY & GALT, for the appellees.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

The only question, of any real importance, presented by this record, which we are disposed to discuss, is, "Were the dying declarations of the boy admissible in evidence to charge the defendant?"

The action was case, to recover damages for death occasioned by the careless management of a railroad locomotive, and brought by the father of the boy killed, as his next of kin and personal representative.

This is a new question in this court, and quite an interesting one, which we lack time to discuss at any great length. A few principles of evidence will be noticed, and such opinions as text writers on evidence or courts of justice may have declared on the point.

The general rule is, that hearsay evidence, that is, statements coming from one not a party in interest, and not a party to the proceeding, and not made under oath, are not admissible, for the reason that such statements are not subjected to the ordinary tests required by law for ascertaining their truth, the author of the statements not being exposed to cross-examination in the presence of a court of justice, and not speaking under the penal sanction of an oath, with no opportunity to investigate his character and motives, and his deportment not subject to observation. And the miscon struction to which such evidence is exposed, from the ignorance

or inattention of the hearers, or from criminal motives, are powerful additional objections.

There are, however, well established exceptions to this rule, whether wisely so or not is certainly a grave question, and among them are dying declarations. These are understood to be statements made by a person under the immediate apprehension of death, and who did die soon after.

In 1 Phil. Ev. 215, it is said, the declarations of a person who has received a mortal injury, made under the apprehension of death, are constantly admitted in criminal prosecutions, and are not liable to the common objection against hearsay evidence, partly for the reason that the awful situation of the dying person is considered to be as powerful over his conscience as the obligation of an oath, and partly on a supposed want of interest, on the verge of the next world, dispensing with the necessity of a cross-examination.

Without questioning the soundness of this last reason, obnoxious as it may be to fair criticism, it may be safely said, the exception itself deprives an accused party of a most inestimable privilege secured to him by the 9th section of article 13 of our State constitution, " to meet the witnesses face to face," so that, by cross-examination, the truth may be eliminated. The exception is in derogation of common right, for, independent of constitutions and laws, an accused person has the right to have the witness, who is to condemn him, in his presence, so that he may be subjected to the most rigid inquisition. To hang a man on the statements of one who is on his dying bed, racked with pain, incapable, in most cases, of giving a full and accurate account of the transaction, weakened in body and in mind, and though in *articulo mortis,* harboring some vindictive feeling against him who has brought him to that condition, is, to say the least, and has always been, a dangerous innovation upon settled principles of evidence, and no court ought to be disposed to extend it to embrace cases to which it did not, in its inception, apply. The rule itself has

no great antiquity to recommend it, it having been first declared by Lord Chief Baron EYRE, at the Old Bailey, in 1789, in Woodcock's case, 1 Leach Crown Law, 500, in which the monstrous doctrine was held, that, although the declarant did not apprehend she was in a critical state—in momentary expectation of death,—soon to appear before the throne of the Eternal, and although the witnesses could give no satisfactory information as to the sentiments of her mind upon that subject, and the surgeon testifying that she did not seem to be at all sensible of the danger of her situation, and never saying whether she thought she should live or die, the court held, on its own conviction, that she was in a condition rendering almost immediate death inevitable, and as persons about her thought she was dying, her declarations, made under such circumstances, ought to be considered by the jury as being made under the impression of her approaching dissolution, when the case showed, by the most positive proof, she had no impressions upon the subject. Having no such impression, how could her conscience have been touched? The prisoner was convicted and executed, thus adding one more to the judicial murders which blacken the page of history. And this is the leading case in support of the exception.

To tolerate this exceptional rule, the declarant ought to be, at the time of making the declarations, under the impression of almost immediate dissolution, and without any hope of recovery. When that has departed,—when he is conscious he is, in a moment, to be among the dead, and his soul to take its flight from the body,—thus circumstanced, it might be said, his declarations, understandingly made, were of equal force with his testimony delivered in a court of justice, and entitled to be received, and justly, were it not for the fact, the accused was not present and had no opportunity to cross-examine him. The bed of death affords no opportunity for this, and the accused may become the victim of statements, which, by reason of the fading condition of the body, in which the mind

must in some degree participate, of him who makes them, depriving them of that clearness, distinctness and correctness which should characterize them, and destitute of which, human life should not be sacrificed by them.

In looking into the books, we find that such declarations are restricted to cases of homicide,—not those resulting from accident or mischance, but felonious homicide.

The cases in England in which they were received, and not in cases of felonies, were the cases cited by appellee, in 3 Burrow, 1244, *Wright* lessee of *Clymer* v. *Littler.* The declarations admitted in that case were the confessions of the forger himself, made on his death bed, and Lord MANSFIELD said he should admit them as evidence, but that no general rule could be drawn from it. The same was the case of *Aviston* v. *Lord Kinnaird,* 6 East, 195.

These two cases, the learned author (Philips on Evidence) thinks, were overruled by the case of *Stobat* v. *Dryden,* 1 Meeson & Welsby, 615, and are not supported by the deliberate judgment of any court, but that the disposition of courts was rather to restrict the admissibility of dying declarations, even in criminal cases.

The true foundation of the rule, that they were admissible in cases of felonious homicide, were policy and necessity, since that crime is usually committed in secret, and it can not be allowed to such an offender, to commit the crime, and, by the same act, still forever the tongue of the only person in the world which could speak his crime.

That they are not admitted in civil cases is held by most courts in this country and in England. The only case to the contrary, is the one referred to by appellee as decided in North Carolina. *McFarland* v. *Shaw,* 2 N. C. Law R. 102. This was a case for seduction, brought by the father, and he was permitted to give in evidence the dying declarations of his daughter, that the defendant was her seducer.

The leading case in this country against their admissibility in civil cases, is *Wilson* v. *Boerem*, 15 Johns. 286, opinion of the court by THOMPSON, Chief Justice, referring to the case of *Jackson* v. *Kniffen*, 2 ib. 35, opinion by LIVINGSTON, J. The same rule was held in *Gray* v. *Goodrich*, 7 ib. 95, which appellee has cited, where it is said "the law requires the sanction of an oath to all parol testimony. It never gives credit to the bare assertion of any one, however high his rank or pure his morals. The cases of pedigree, prescription or custom are exceptions to this rule. What a deceased person has been heard to say, except upon oath, or *in extremis*, when he came to a violent end, never has been considered as competent evidence." This, clearly, has no reference to a civil case, but to a criminal prosecution for a felonious homicide. See, also, *Kent* v. *Walton*, 7 Wend. 256.

We think it may be safely said, that the rule at present prevailing in this country and in England on this subject, is, that in no case, save that of a public prosecution for a felonious homicide, can dying declarations of the party killed be received in evidence, and to this extent, and no further, are we inclined to go.

In civil cases they are not admissible. To admit the dying declarations in this case was error, and for that error the judgment must be reversed and the cause remanded.

*Judgment reversed.*