## No. 13,445.

### REPPIN *v.* THE PEOPLE.
(34 P. [2d] 71)

Decided June 18, 1934.

Mr. Philip Hornbein, Mr. David Rosner, for plaintiff in error.

Mr. Paul P. Prosser, Attorney General, Mr. Charles H. Queary, Assistant, Mr. Clyde L. Starrett, Mr. Thomas I. Purcell, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Walter Reppin, a minor, referred to herein as the defendant, brings here for review a death sentence in a homicide case. The Honorable Arthur Cornforth presided at the trial.

On August 11, 1933, in the evening, the defendant armed himself with a .38 caliber gun and a .44 caliber gun, both loaded, and telephoned for a taxicab. When the taxicab, driven by Vincent Regan, arrived, the defendant entered, drew the guns on Regan and ordered him to drive where he was told. Near Evergreen cemetery he ordered Regan out of the taxicab and made him lie on the ground, face down. Hearing an automobile approaching, the defendant hit Regan on the head with the

larger gun. Regan jumped up and started to fight. The defendant knocked him down and backed away. As Regan came toward him, the defendant shot him, and then jumped into the taxicab and drove away. The driver of a passing automobile took Regan to a hospital, where he made a statement, and died. The defendant was arrested and confessed that he shot Regan. He said that he "wanted the cab to pull a stickup." An information was filed, charging him with murder; the court appointed an attorney for him; the defendant pleaded guilty; evidence was taken before a jury; they fixed the penalty at death; and sentence was pronounced accordingly. Thereafter, through his present counsel, he petitioned the trial court to set aside the verdict and the sentence. The court, the Honorable John C. Young presiding, denied the petition, and the defendant is here seeking relief.

Several assignments of error are argued. They present the following points: Error was committed, it is said, in failing to furnish the defendant with a list of the jurors at the time of his arraignment. Other assignments are that the court erred in accepting the plea of guilty, in admitting in evidence a dying declaration, in receiving evidence of independent, unrelated offenses, and in instructing the jury, in effect, to find the defendant guilty of murder of the first degree. Of these in their order.

1. *The list of jurors.*

Section 7067 of the Compiled Laws provides that every person charged with murder or other felonious crimes shall be furnished, previous to his arraignment, with a list of the jurors. It is suggested by counsel for the defendant that the record shows that this requirement was not complied with. That is a mistake; the record is silent on the subject. The most that can be said is that the record does not affirmatively show a compliance with the statute. But there is no requirement that the record shall show such compliance. There was no objection in the trial court on account of any failure

to furnish the list of jurors. In the circumstances, it will be presumed that the trial court proceeded regularly. It is not contended that the list was not furnished; but if such was the case, the defendant waived the irregularity by not objecting in the court below. *Parker v. People,* 13 Colo. 155, 21 Pac 1120. Furthermore, what was said in *Hendricks v. People,* 78 Colo. 264, 241 Pac. 734, is applicable here: "The record does not disclose that any challenges whatever were made by the defendant to any of the jurors. Moreover, there is nothing in the record to show prejudice or bias on the part of the jury, or that it was not a fair and impartial one." Even if the list was not furnished (and there is nothing in the record to indicate that it was not), the defendant's substantial rights, in the circumstances, were not prejudiced by such omission. Unless the accused was put to a disadvantage from the irregularity, if there was such, his conviction ought not to be interfered with because of the irregularity. C. L. §7103; *Goodhue v. People,* 94 Ill. 37, cited in *Minich v. People,* 8 Colo. 440, 447, 9 Pac. 4.

This assignment of error cannot be sustained.

2. *The plea of guilty.*

■ It is said that as the defendant is a minor, it was error to accept his plea of guilty.

At the time of pleading, the defendant was 18 years, 3 months and 5 days old. We have several statutory provisions bearing upon the status of minors in the criminal law. Section 6636 of the Compiled Laws provides that an infant under the age of ten years shall not be found guilty of any crime or misdemeanor. Criminal intent is manifested by the circumstances connected with the perpetration of the offense and the sound mind and discretion of the accused. C. L. §6634. In section 6635 it is provided: "A person shall be considered of sound mind who is neither an idiot, nor lunatic, nor affected with insanity, and who hath arrived at the age of fourteen years, or before that age, if such person know the distinction between good or evil." Section 6665 provides

"That no person shall suffer the death penalty who, at the time of conviction, was under the age of eighteen (18) years." Those who are over the age of eighteen years at the time they are convicted of murder of the first degree, except those convicted on circumstantial evidence alone, shall be sentenced to suffer death if that penalty is fixed by the jury. *Wechter v. People,* 53 Colo. 89, 100, 124 Pac. 183. When the defendant was sentenced, his age was 18 years, 3 months and 20 days.

In 16 C. J., p. 401, it is said that "The fact that accused is a minor does not preclude his entering a plea of guilty to a criminal charge." And see *People, ex rel. v. Wandell,* 21 Hun. 515; *Ex Parte White,* 50 Tex. Cr. Rep. 473, 98 S. W. 850; *Ledrick v. United States,* 42 D. C. App. 384. In Ex Parte White the court said that "The fact that appellant was a minor would not preclude his entering a plea of guilty to a criminal charge."

In *Ledrick v. United States, supra,* the court said: "It is the duty of a court not to receive a plea of guilty in the case of an infant, and not to permit him to be convicted unless his capacity to commit crime has been satisfactorily shown, and that he understands the nature and consequences of his plea of guilty."

Whether the accused is a minor or an adult, the court, upon tender of a plea of guilty, should exercise caution in proportion to the gravity of the consequences. 2 Bishop's New Criminal Procedure (2d Ed.), §795. Pleas of guilty are "sufficient to found a conviction, even if to be followed by sentence of death, they being deliberately made, under the deepest solemnities, with the advice of counsel, and the protecting caution and oversight of the judge." 1 Greenleaf on Evidence (16th Ed.), §216. In the present case the plea of guilty was so made. On August 21, 1933, the court appointed a lawyer to defend the accused. For over three weeks before pleading, the defendant had the benefit of conferences with his attorney. The victim of the homicide had made a dying declaration to the effect that the defendant shot him, and

the defendant had made repeated confessions of guilt. He pleaded guilty on advice of counsel, and after the court fully explained to him the effects and consequences of such a plea. Though a minor, he was not a child of tender years, and there is no suggestion in the record that he was mentally defective. His confessions and his testimony indicate that the defendant understood, not only the nature of the crime he committed, but also the nature and consequences of a plea of guilty.

Counsel site, as controlling, the case of *Ridge v. State,* 25 Okla. Cr. 396, 220 Pac. 965, and quote the following from the opinion: "An infant can neither sue nor defend a suit in a civil action, and with even less propriety can an infant waive his substantial rights in a criminal proceeding, and where a court arbitrarily appoints a stranger to represent him, the person so appointed should, in a capital case, refrain from waiving any of the provisions of the statutes designed for the infant's protection, unless it appears beyond all doubt that the infant fully understands the effect and the results growing out of such waiver."

But that was said in a case where the defendant was only 13 years and 8 months old, and where the court thus describes the proceedings: "A condensed recapitulation of the steps taken shows that at a hearing had in the juvenile court on September 12, 1922, Elias Ridge was adjudged to be a delinquent child, knowing the wrongfulness of his acts at the time he committed the fatal assault; that on the same day an information was filed in the district court, charging him with murder; that on the same day a purported preliminary hearing was had before the county court, in which an attorney not employed by the accused or anyone for him, but later appointed by the district court, waived his preliminary hearing; that from the county court the accused was taken immediately before the district court, where this attorney was appointed to represent him; that the accused was there arraigned and on advice of his counsel

pleaded guilty; that under instructions from his appointed attorney he also waived the statutory time for the pronouncing of sentence, whereupon the accused was sentenced to die in the electric chair; that all of this was done on the 12th day of September, 1922. Every step taken, from the judicial finding in the juvenile court to the signing of the death warrant in the district court, was done between the rising and the setting of the sun.''

In that case the attorney general, the county attorney who prosecuted the case, and other attorneys employed to aid in the prosecution, joined in confessing error. The judgment was reversed and the cause was remanded. Upon the trial the jury found him guilty, and again he was sentenced to death. *Ridge v. State*, 28 Okla. Cr. 150, 229 Pac. 649. The appellate court affirmed the conviction, but, acting under authority expressly conferred by statute, reduced the sentence to life imprisonment.

It is unnecessary to dwell upon the differences between the Ridge case and the case at bar; they are obvious.

Another case relied upon by the defendant's counsel is *State of Kansas v. Oberst*, 127 Kan. 412, 273 Pac. 490, where it was held error to permit a seventeen-year-old defendant, without an attorney to consult and advise him, to plead guilty to seven charges of murder of the first degree; and also that it was error to refuse to set aside the sentences and permit the defendant to withdraw his pleas of guilty, when his counsel, belatedly employed, presented a motion to that effect. If the defendant in the case at bar had been given no opportunity to consult counsel before pleading, the Oberst case would be in point; but, as we have seen, such was not the case.

We are of the opinion that the court did not err in accepting the plea of guilty.

3. *The dying declaration.*

Vincent Regan was shot on December 11, 1933. He was taken at once to a hospital. When Doctor Shivers and Chief of Police Harper arrived they found Regan on the operating table. He was conscious, but was in

intense pain. He was suffering from a mortal gunshot wound and from loss of blood. The bullet had penetrated the liver, and there was an extensive internal hemorrhage. His condition was so serious that the doctor had ordered an immediate operation. After conversing with the doctor to ascertain whether or not Regan was in a dying condition, Harper, in the doctor's presence, told Regan that he, Regan, was about to die, and that any statement he might make should be the truth. Doctor Shivers testified as follows: "Q. Did you hear Chief Harper state to Vincent Regan that *he was about to die from the wounds he had received,* and that any statements he made should be the truth? A. I heard such a statement." After that statement was made to him, Regan, in the presence of Harper and the doctor, made a detailed statement of the circumstances of the shooting.

To make a dying declaration admissible in evidence, it is not necessary that the declarant should have stated at the time that it was made under a sense of impending death. The law is thus stated in 1 Greenleaf on Evidence (16th Ed.), section 158: "It is enough, if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind." And see 1 R. C. L., p. 545; 1 Wharton's Criminal Evidence (10th Ed.), §282.

And Professor Wigmore, in his work on evidence, section 1442, says: "In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances.

"It has been contended that only the *statements of the declarant himself* could be considered for this purpose; or, less broadly, that the *nature of the injury alone* could

not be sufficient, i. e., in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude. * * *

"No rule can here be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances."

In *Territory v. Eagle,* 15 N. M. 609, 110 Pac. 862, where the wound was characterized as "terrible," it was held that consciousness of impending death may be inferred from the character of the wound and the physical condition of the declarant, without any statement by him, or any conduct, indicating a consciousness of impending death.

In *Commonwealth v. Puntario,* 271 Pa. St. 501, 115 Atl. 831, it was held that the sense of impending death may be inferred from the nature of the wound, without any express declaration to show that the declarant was sensible of impending death.

In *Gipe v. State,* 165 Ind. 433, 436, 75 N. E. 881, the court said: "That the character of the wound may of itself warrant the inference that the declarant was under a sense of certain and speedy death, is settled upon the authorities."

In *Dunn v. State,* 2 Ark. 229, it was said that apprehension of impending death "may be collected from the nature and circumstances of the case, although the declarant did not express such an apprehension."

In *State v. Gray,* 43 Or. 446, 74 Pac. 927, it was held (quoting from the syllabus): "Where a person who had been shot in an altercation was aware that his injuries

were very severe, and had been informed by the attending surgeon that he necessarily had to die of his wounds, and that a statement by him would probably be serviceable in clearing up the matter, a corrected and signed written statement is competent evidence as a dying declaration, though the signer did not orally express his belief in impending death." To the same effect is *State v. Thompson,* 49 Or. 46, 88 Pac. 583.

Although in *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018, and *Brennan v. People,* 37 Colo. 256, 86 Pac. 79, some statement was made by the declarant indicating the apprehension of impending death, and therefore the cases are not directly in point. We recognized the rule to be as stated above. Thus, in the former case we referred with approval to Professor Greenleaf's statement, supra.

At the time Regan made his statement he was mortally wounded and was about to undergo a serious operation under the doctor's orders. He was in the condition already described, and the chief of police, after conferring with the doctor, made, in the doctor's presence, the statement appearing above. Manifestly, in view of all the circumstances, the trial court was warranted in finding that Regan's declaration was made under a sense of impending death, and in admitting it in evidence as a dying declaration.

Immediately after making his declaration, Regan was operated upon in an unsuccessful attempt to save his life. He died three days after receiving the mortal wound.

We hold that there was no error in admitting the declaration in evidence.

The defendant, in his confession and also in his testimony at the trial, stated substantially everything that Regan stated in his declaration. Hence, even if it was error—and we have seen that it was not—to admit Regan's declaration in evidence, the error would be harmless. As it would not tend to prejudice the substan-

tial rights of the defendant on the merits, it would not be reversible error.  C. L., §7103.

■  4.  *The instruction.*

The court instructed the jury that the only issue for them to determine was whether the punishment to be inflicted should be death or imprisonment for life.  It is said that this was in disregard of section 6665 of the Compiled Laws, which provides: "If any person indicted for murder shall plead guilty to ·the indictment, the court shall thereupon impanel a jury as in other cases, to which shall be submitted, as the sole issue in the case, the question whether the killing was murder of the first or second degree.  The jury in every such case shall find the degree thereof, and, if murder in the first degree, shall fix the penalty at death or imprisonment for life."

In *Garvey v. People,* 6 Colo. 559, we considered a provision in the amendatory act of 1881 (S. L. 1881, p. 70), requiring the court, upon plea of guilty of murder, to submit to the jury the question of whether or not the killing was deliberate or premeditated, or was done in the perpetration or attempt to perpetrate some felony; and providing that no other question should be submitted to the jury.  We said that prior to that act, to authorize a sentence of death, the jury, upon the trial, were required to make such a finding; but that no provision was made for submitting to a jury the grade of the offense where the defendant pleaded guilty; that upon a plea of guilty, therefore, the death penalty could not be inflicted, no matter how atrocious the murder; and that the amendatory act of 1881 was intended "to change the effect heretofore accorded the plea of guilty so that the death penalty might be imposed, notwithstanding the plea." The quoted provision of section 6665, supra, evidences the same intent.  Neither the act of 1881, nor the quoted provision of section 6665, supra, was intended to require the court to submit to the jury the question of second-degree murder when, as here, there is no evidence of murder of that degree.  That same section (6665) also

contains this provision: "The jury before which any person indicted for murder shall be tried, shall, if it find such person guilty thereof, designate by its verdict whether it be murder of the first or second degree." That provision is just as emphatic in its terms as is the provision relating to the procedure on plea of guilty; and we have held that the provision last quoted does not require the court, upon the trial, to submit to the jury the question of second-degree murder where there is no evidence of murder of that degree. *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103. And see *Dickens v. People,* 67 Colo. 409, 186 Pac. 277. The matter is discussed at length in the opinions in those cases.

In the present case, the murder admittedly was committed in the perpetration of robbery, and in no other way, and therefore it was murder of the first degree. C. L., §6665. Murder of the second degree was not in the case; hence the only question for the jury to determine was the punishment to be inflicted. In confining the jury to a determination of that question, the court committed no error.

5. *Evidence of other offenses.*

We come now to assignments of error that must be sustained.

While in custody the defendant was questioned repeatedly and at length by the chief of police, the district attorney and the deputy district attorney, not only with reference to the killing of Regan, but also with reference to other offenses. The first question asked was "What is your name?" After giving his name, the defendant was asked, "Was that the name you were arrested under in Newark?" He answered, "Yes, sir, only they spelled it Rippen." "(Q). What were you arrested for there? A. Conspiracy. Q. What for? A. I wasn't in on it. I loaned a fellow a gun. He was planning on getting the Fox Terminal theater. Q. Just a plain stickup? A. Yes." That arrest occurred in New Jersey some two

years before the killing of Regan. At the trial those questions and answers were admitted in evidence.

At the trial the chief of police, while relating his conversation with the defendant, was permitted, over objection, to testify as follows:

"He said he had a vision of being able to build up a gang of about six men to go out to the Broadmoor Hotel and catch it at a time when there was a large number of diners in the dining room of the hotel and hold up the dining room.

"Q. And did the defendant make any statement to you with reference to his thought of the ability of Stone and Ryan to be members of that gang? A. He said that he thought that Stone and Ryan would make splendid men for such a job, but that he had tried out another man a night or two before—

"Mr. Dolph: To which we object. We are trying a murder case, and this is all about conspiracy.

"The Court: I think it shows arrangements on the part of the defendant. The objection is overruled. Go ahead.

"Mr. Dolph: Exception."

The chief of police was permitted to testify that the defendant stated that on August 8 he cleaned and oiled his gun, put cartridges in it, and, together with a companion, went to a place called the Pot and Spigot, intending to hold it up, but that his companion lost his nerve—"got yellow"—so they went back to town.

In answer to questions concerning offenses in El Paso county, other than the killing of Regan, the defendant stated in his confession that on July 3, 1933, he and two other boys broke a plate glass window at Kline's and stole three guns, one of which he carried when he killed Regan; that on July 7 or 8, they "were in the Country Club stickup"; that they drew a gun on the men in charge, tied them up, and got $12 out of the register; and that on the next night he and one Ryan went to a filling station, where the defendant drew a loaded gun

on the attendant, locked him in the toilet and took the money out of the till. These statements were admitted in evidence. There also was introduced the testimony of those named by the defendant as his accomplices in the several offenses committed in El Paso county. The defendant took the witness stand in his own behalf. In answer to questions asked by his appointed attorney and by the deputy district attorney, the defendant made substantially the same statements that he had made in his confession.

The trial upon a plea of guilty is to determine whether the killing was murder of the first or second degree, and, if the former, whether the penalty should be fixed at death or imprisonment for life. Of course, it is impossible to determine the degree until the evidence is all in. The rules governing the admissibility of evidence when a murder trial is upon a plea of guilty are the same as those applicable when the trial is upon a plea of not guilty. In both cases incompetent and irrelevant evidence should be excluded, and, as we shall see further on, evidence admissible for a limited purpose only should be limited by the court to that purpose. After the evidence is all in, if it appears that there is evidence that would justify a verdict of either degree, the court submits to the jury the question of degree. But if, as in this case, the uncontradicted evidence is to the effect that the murder was committed in the perpetration of a robbery, the murder is declared by our statute to be of the first degree, and the court, as we shall see, is required to submit to the jury the sole question of the penalty to be fixed.

What, then, is the law relating to the admissibility of evidence of offenses other than the offense charged? It is thus stated in *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325: "The general rule is that evidence is not admissible which shows or tends to show that the accused has committed a crime wholly independent of the offense for which he is on trial. It is not proper to raise a presumption of guilt on the ground that, having committed one

crime, the depravity it exhibits makes it likely he would commit another. The reason for the rule is that no person shall be convicted of an offense by proving that he is guilty of another. Evidence of this character tends to create a prejudice in the minds of the jury against the accused; multiplies the issues, and may confuse and mislead the jury. The general rule should, therefore, be strictly enforced in all cases where applicable. To this rule, however, there are exceptions.'' One exception is where such evidence bears upon the question of intent. We quote further: ''When such testimony is received the trial judge should then limit it to the purpose for which it is admitted. Perhaps we have never determined that a failure to so limit it when not requested by the defendant is reversible error, but we have intimated in Warford v. The People [43 Colo. 107] that this course should be pursued by trial courts. We also think that when evidence of the character under consideration is offered by the district attorney, good practice requires that he should state the purpose for which it is offered, and that the trial judge in the instructions given, when requested by the defendant, should instruct the jury on the subject of the purpose for which they may consider such testimony. These precautions should be observed, because of the fact, as above indicated, that such evidence tends to create a prejudice in the minds of the jury; but of this he will not be permitted to complain if the evidence is competent, and his rights are safeguarded in the manner we have suggested.''

In *Warford v. People,* 43 Colo. 107, 114, 96 Pac. 556, we said: ''It may be said that the court, in receiving the testimony, should have limited it at the time it was given to the purpose which we have indicated. Generally speaking, we think this course should be pursued by trial courts.''

We quote the following from the opinion in *Hillen v. People,* 59 Colo. 280, 283, 149 Pac. 250: ''It is, however, objected that, inasmuch as the state had defendant's con-

fession, and subsequently introduced it in evidence, there was no necessity for testimony as to these other offenses. Good practice, it would seem, in view of the danger that this kind of evidence may be misapplied to the injury of the accused, might require the state to offer the confession first, and if received, to put in no further evidence of other crimes, unless clearly necessary. Yet, a failure to follow that course is not, according to the authorities, error.''

The court erred in permitting the chief of police to testify, over the defendant's objection, to the defendant's statements with reference to his "vision" concerning a holdup at the Broadmoor hotel, and those with reference to the Pot and Spigot incident. No holdup occurred, nor was one even attempted. That testimony does not come within any exception to the rule excluding evidence of other offenses. The error was prejudicial and reversible.

For the same reason, it was prejudicial and reversible error to admit that part of the confession that related to the defendant's arrest in 1931, in New Jersey, for conspiracy. True, the defendant's appointed counsel interposed no objection to such evidence, or to the evidence concerning the Pot and Spigot incident, and we are not required to consider objections not made below. Nevertheless, we may, and sometimes do, consider such objections when we feel that a seriously prejudicial error was made and that justice requires such consideration. We have done so in cases involving adults; and where the life of a minor is at stake, the call to do so is more imperative.

Let it not be supposed that, because the evidence of the defendant's guilt is clear, the error in admitting the testimony relating to the New Jersey conspiracy charge, the "vision" concerning the Broadmoor hotel holdup and the Pot and Spigot incident should be held to be harmless. In *Farris v. People,* 129 Ill. 521, 21 N. E. 821, evidence of an independent offense was im-

properly received. The court said (p. 533): "It is suggested, and pressed by way of argument, that although the trial court may have erred in allowing this proof, yet, the case being so clearly made out by other evidence and the defense so utterly futile, the error should be held harmless. If the only punishment for the crime of murder in this state was death, the point would be entitled to weight. If it was within the province of the court to assume that the jury would have inflicted the death penalty because the proof of guilt justified it, or if our decision was to affect this case alone, we might hesitate to order a reversal on this theory. The legislature has seen fit to clothe juries with a wide discretion in fixing the punishment to be inflicted upon one convicted of murder. Every defendant on trial for that crime is entitled to the full benefit of the statute. When all else has failed him, he has a right to stand before a jury unprejudiced by incompetent, irrelevant evidence, and appeal to them to spare his life. It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence, much less is it our province to say what they should have done."

In *People v. King,* 276 Ill. 138, 114 N. E. 601, counsel for the people suggested that even though evidence of independent crimes was improperly admitted, competent evidence supported the verdict and therefore there should be no reversal. After dwelling at length upon the other offenses, he declared that the defendant was a desperate and dangerous criminal, and that ruthless murder of peaceful citizens was to be a part of the program if any luckless person refused to be robbed. Rebuking counsel for making such an argument, the court said (p. 151): "This is hardly proper argument to make in this court. It might be effective if made to a mob in order to incite them to lynch a man, but can have no place before a jury or court unless our entire theory of criminal jurisprudence is revolutionized. A man cannot be convicted of a given crime solely because he is a bad man gener-

ally or has committed other crimes for which he has not been punished."

To the credit of counsel for the people be it said that they make no such argument in the case at bar.

The evidence in question, coupled with the court's failure to limit the effect of the evidence relating to other offenses—a matter to which we will address ourselves in the next paragraph—was well calculated to close the minds of the jury to any consideration of mercy or leniency and induce the jury to fix the penalty at death instead of at life imprisonment; and that may have been its effect.

▮▮▮▮ The offenses committed in El Paso county were of the same character as the crime charged; they were sufficiently connected in point of time to meet the requirements of the law; and the same motive may reasonably be imputed to them all. The evidence thereof bore upon the intent with which the defendant shot Regan and the motive that prompted the act, and was admissible, but only for the purpose of determining such intent and motive. *Hillen v. People,* 59 Colo. 280, 149 Pac. 250; *Clarke v. People,* 53 Colo. 214, 125 Pac. 113; *Housh v. People,* 24 Colo. 262, 50 Pac. 1036. Such evidence was not rendered inadmissible by the fact that the trial was upon a plea of guilty instead of upon a plea of not guilty. It cannot successfully be contended that as a plea of guilty raises no issue of intent, evidence of other offenses is not admissible to show intent. If such were the case, evidence of the homicide itself would not be admissible upon a plea of guilty, because such a plea admits the homicide. That, of course, is not the law. When such evidence would be admissible where the plea is not guilty, it is admissible where a defendant pleads guilty and evidence is submitted to a jury under section 6665, supra.

Although such evidence was admissible for a limited purpose only, the court did not, either when the evidence was received or in the instructions to the jury, limit it

to the purpose for which it was admitted and for which alone it was admissible.

We have called attention to the grave danger that evidence of other offenses may be misapplied by the jury to the injury of the accused, and have said that when such evidence is offered the district attorney should state the purpose for which it is offered, and that when it is received the trial court should limit it to the purpose for which it is admitted. True, in this case no request to so limit it was made by appointed counsel for the defendant, and we have not held that in such circumstances the court's failure so to limit the evidence is reversible error. But we have not had occasion heretofore to consider the effect where, as here, the defendant is a minor.

In *Rausch v. Cozian,* 86 Colo. 389, 390, 282 Pac. 251, we said: "The plaintiff is a minor and a ward of the court, and under such circumstances, the court is in duty bound to protect her rights, which cannot be waived either by her guardian ad litem or her attorney." And the Court of Appeals thus stated the law in *Lowrey v. Harlow,* 22 Colo. App. 73, 88, 123 Pac. 143: "In all civilized countries the law exercises a constant vigilance over the property rights of minors. Civilization would be a failure if the property of children under the age of discretion were not so guarded." Such is the law when an infant is a party in a civil action. In a homicide case, where the question is whether a minor defendant shall live or die, it should be, and we hold that it is, the duty of the court, without request, to explain to the jury the purpose for which evidence of other offenses is admitted, and to direct the jury to consider it for that limited purpose only. The failure of the court in this respect in the present case was highly prejudicial to the defendant and was reversible error.

From what has been said in part 5 of this opinion, it is obvious that the defendant did not have the fair trial to which the law entitles him.

The judgment is reversed.

MR. JUSTICE HILLIARD, MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND concur specially.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE CAMPBELL and MR. JUSTICE BURKE dissent.

MR. JUSTICE HILLIARD, specially concurring.

I concur in the judgment of reversal, but I am not in accord with the adverse disposition of certain points urged in behalf of plaintiff in error. I recount them briefly.

1. So sacred are the material interests of a minor regarded in Colorado that he may not waive the slightest property right, nor can the most competent and thoughtful guardian make waiver for him. With whatever righteousness of claim, he who would possess that which a minor has, the minor acquiescing ever so formally, must make convincing proof. By what rule of reason, therefore, can it be said that a minor may plead guilty on a charge involving his liberty, and particularly, as here, of his right to continue in being? I submit that logic and the humanities alike should prompt us to give pause. My study convinces me that a distinction exists between the right to receive a minor's plea of guilty, necesarily foreclosing the principal issue, and his confession, which, subject to pertinent attack and explanation, may be admitted and considered as evidence. The record here presented opportunity for the suggested discriminating procedure. Its observance, as I conceive, would have served the ends of justice; and beyond that ministers of the law may not be concerned.

2. I think it was error to admit the so-called dying declaration of the deceased. Neither directly nor indirectly did the deceased indicate that he believed he would not survive. The record does not show that he referred to his condition. What is designated as his dying declaration is the story told by Chief of Police Harper, related in the interview he had with the deceased three

days prior to his death. After stating that the deceased was conscious and that he had a conversation with him relative to who had shot him and in what manner, the following occurred: ''Did you at that time have a conversation with the doctor to ascertain whether he was in a dying condition or not? I did. After your conversation with the doctor, did you advise Vincent Regan prior to your conversation with him with reference to the gunshot wound that he probably was dying and that any statements he made should be the truth? I did. After you advised him of the fact what did Vincent Regan tell you with reference to the gunshot wound?'' I pause here to say the doctor, also called as a witness, did not testify that he said to Chief Harper that Regan was about to die or would not recover, nor did Harper himself say the doctor said Regan could not get well. The doctor, who testified that he was present only at times during the interview conducted by Chief Harper, emphasized, as did Harper, that Regan was conscious and his mental faculties were working. It is not without its bearing, I think, that after detailing the manner thereof the doctor said the operation he performed was ''proper to relieve and try to save the life of Vincent Regan from the gunshot wounds.'' At no time did the doctor testify he thought Regan would not survive, and the quoted statement is consonant with belief that he might recover. The record does not show that in the presence of Regan Harper asked the doctor whether Regan would recover, and, as already narrated, Harper does not say what the doctor said. He simply says that after having a talk with the doctor on the subject, he told Regan he probably would not recover. In last analysis, the only person who indulged in his presence the speculation that Regan might not survive his wounds was Chief Harper.

Continuing his interview with Regan, Harper gave pages of details, but never did he ask Regan as to his belief of his condition, nor in the course thereof did Regan volunteer his belief on the subject. Mr. Justice

Butler says, "it is not necessary that the declarant should have stated at the time that it was made under a sense of impending death." The authorities cited in support show that in some "mode" the declarant must be shown to have appreciated the hopelessness of his condition. In the state of the record only the interview the declarant had with Chief Harper can be examined to determine what was Regan's belief, and there nothing is said which shows the least apprehension on his part. One of the texts cited by Mr. Justice Butler plainly says, and the others contain statements of like import, that where the declarant does not himself say he is under sense of impending death, it may be inferred from the "opinions of the medical or other attendants, stated to him." I re-emphasize that the record does not show that the doctor told Regan, or said in his presence, anything to the effect that his death was impending. On the contrary he operated in a "proper way to save his life." Only Harper suggested that death was impending, and that was softened by the use of the word "probably." Had the district attorney been present it is likely developing questions would have been submitted to the declarant, but since he was not there, we may not speculate as to what would have occurred. It suffices to remark that the record is silent on the essentials of a dying declaration. I cannot allow to go unchallenged the apparent claim that the cases of *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018, and *Brennan v. People,* 37 Colo. 256, 86 Pac. 79, support the opinion of the court. In the Zipperian case we said: "One of the exceptions to the rule which excludes hearsay evidence pertains to dying declarations. They are admissible in evidence 'where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declaration.' If made when the deceased is *in extremis,* with a belief entertained by him that his death is imminent and there is no further hope for him in this life, they may be admitted in evidence though the de-

fendant was not present at the time they were made and had no opportunity for cross-examination." There objection was offered because, "when the declarations were made Luxsinger did not believe that he was about to die, nor was it made to appear that he had given up all hope of recovery." Mr. Justice Campbell, speaking for the court, said: "At different times during the day of his death, while not in express terms, saying that he believed death imminent, and that he had no hope of recovery, Luxsinger made other statements from which it is clearly apparent that such was his firm belief." That the contrast between the Zipperian case and our present inquiry may be further emphasized, I call attention to the record proper there, where the witness, purporting to give the statement of the deceased, said: "He said to me, 'Well Reese they have got me this time.' I said in rather a cheerful way, 'Don't worry about that; you may get over this yet.' He said, 'No I can never get over this, I have got to die.' " Here the deceased not only said nothing expressly, but made no "other statements" relative thereto. The record does not show that any effort was made to ascertain the belief of the deceased as to his condition, nor did he speak on the subject. "The rule is universal that before dying declarations can be admitted in evidence it is essential, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death." 1 R. C. L., p. 544, §90. The test, as appears from all the books, is, what the deceased believed, not what third persons, medical or lay, may have thought. The belief of the officer that the wounded man would not recover, and however reasonable, cannot be considered in determining whether the claimed declaration was made under the required sanctity. In the Brennan case, as in the Zipperian case, the determination was that the deceased had said that which made the declaration admissible. The court said: "We think, considering the statement of Mrs. Lowney, that she believed she was

in a dying condition and about to die, and from the mortal nature of her injuries she was aware of the near approach of death, * * * the court properly admitted it in evidence." In the record, following an inquiry of a doctor to Mrs. Lowney, "if she knew the condition she was in there," the following occurred: "The court: What was the answer to that? A. Her answer to Mr. Long, she said she did; she knew she was in a dying condition, suffering very much from pain. Q. What did she say about dying? A. She said she felt she was in a dying condition." I cannot believe the Zipperian and Brennan cases support the court's conclusion. No other Colorado case is referred to, and I have been unable to find a case in this jurisdiction which supports the holding here. In justifying the admission of the declaration, our learned brother observes that, "even if it was error * * * the error would be harmless." Strange enough, the predicate is that defendant confessed and testified to "everything that Regan stated in his declaration." Bearing in mind that dying declarations are admitted upon the ground of necessity, no other evidence being available, the very statement in the opinion operates to defeat the conclusion reached. When we recall the further fact that in addition to his testimony and confession, the defendant entered a formal plea of guilty, emphasis is given to the absence of necessity. "Such admission was, and is, an exception to, and almost an outrage upon, the doctrine that hearsay testimony will not be received, and, this being so, its admission is most justly grounded upon necessity. The witnesses to the crime of homicide are most generally limited to the killer and the killed, and the former might go free of justice, where the act was not seen by a third person, if the statement of the latter, as to the circumstances of the transaction, could not be given." Note, 56 L. R. A. 354. See, also, *Sullivan v. State*, 102 Ala. 135; *State v. Shelton*, 47 N. C. 360. "The true foundation of the rule, that they were admissible in cases of felonious homicide, were pol-

icy and necessity, since that crime is usually committed in secret, and it can not be allowed to such an offender to commit the crime, and, by the same act, still forever the tongue of the only person in the world which could speak his crime." *Marshall v. Railway Company,* 48 Ill. 475. Fairly, I think, we could properly put into effect the principle suggested in *Hillen v. People,* 59 Colo. 280, 283, 149 Pac. 250, where we said: "Good practice, it would seem, in view of the danger that this kind of evidence may be misapplied to the injury of the accused, might require the state to offer the confession first, and if received, to put in no further evidence * * * unless clearly necessary." Finally, I object to "piling Ossa on Pelion." The defendant pleaded guilty in open court, a confession made out of court was detailed by witnesses, and he corroborated it all by his own testimony. That, I submit, was enough. The admission of the declaration, as I conceive the principles of Anglo-Saxon justice, cannot be justified on any hypothesis of the record. It tended unfairly to influence the jury in determining the penalty, the only question submitted. Whatever the crime, and whoever the accused, moderation should attend judicial inquiry.

3. Since plaintiff in error pleaded guilty, I think the trial court erred in not submitting the question of degree to the jury. A provision of section 6665, C. L. 1921, reads as follows: "If any person indicted for murder shall plead guilty to the indictment, the court shall thereupon impanel a jury as in other cases, to which shall be submitted, as the sole issue in the case, the question whether the killing was murder of the first or second degree. The jury in every such case shall find the degree thereof, and, if murder in the first degree, shall fix the penalty at death or imprisonment for life, and the court shall thereupon give sentence accordingly." Instead of observing the statute, the court instructed that "the only issue for the jury to determine is whether the punishment to be inflicted shall be death or imprisonment for life." In a

second instruction the court said: "All murder which shall be perpetrated by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or in the attempt to perpetrate any robbery, shall be deemed * * * murder of the first degree." The effect of the first instruction was to make nugatory an unambiguous enactment of the legislature, within the provisions of which plaintiff in error, by his plea, had fairly placed himself. I submit that regard for legislative control in the matter, exercised and expressed, and recognition of judicial limitations, should prompt us to resolve this point for plaintiff in error. The second instruction, the record considered, was equivalent to a directed verdict of guilty. It cannot be justified.

Before the enactment of this statute in 1881, one charged with murder, however revolting and cruel and unjustified the circumstances, could escape the death penalty by entering a plea of guilty. *Garvey v. People,* 6 Colo. 559. "It is evident that the legislature recognized this construction of the law as being settled in accordance with the practice referred to, from the changes made therein by that body in 1881. These changes relate only to the effect of the plea of guilty." *Garvey v. People, supra.* The legislative act is made abortive here by construing an earlier sentence in the same section to be of such import that on a plea of guilty the court, not the jury, may determine the degree of murder involved. The information does not charge that the homicide was committed in the perpetration of a felony. I grant that is not necessary. *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031. But I maintain that to be measurably consistent in the construction of the statute which plainly says the jury shall determine the degree on a plea of guilty, the one informed against should be apprised by definite allegations in the information that such a plea might operate to deny jury consideration of the degree. If by any stretch of construction the court, in the circumstances of this record, can deprive a defend-

ant of the right to have a jury fix the degree, to which I do not assent, such construction should only be allowed where the information contains allegations, which, if proved, inevitably result in first degree.

While not controlling, it is informative, as indicating the practice, to note the procedure in the Fleagle case. There the information, as here, charged plain murder. Fleagle pleaded guilty. The evidence showed, also as here, that the homicide was committed in the perpetration of a robbery. Contrast the first instruction of the trial court here with the instruction there. The court, after stating the charge, said: ''To this information the defendant herein has entered a plea of guilty; and the sole issue for you to determine is whether the offense in this case is murder in the first degree, or the second degree.'' *Fleagle v. People,* 87 Colo. 532, 289 Pac. 1078. In that case the record shows that the special prosecutor said to the jury, indicating conformity to the practice: ''You have to find first whether this is first or second degree murder.'' In that case, Mr. Justice Adams, speaking for the court, said: ''Jurors are constitutional officers, * * * The court cannot lawfully usurp this power, nor set aside the legislative will.'' In *Abshier v. People,* 87 Colo. 507, 289 Pac. 1081 (the Fleagle matter), Abshier pleaded guilty, and the court warned him as follows: ''It becomes the duty of the court to inform you that under your plea in this case, it will be the duty of the court to impanel a jury in the case, and the jury are to determine whether this is first or second degree murder; and, if first degree murder, they will fix the penalty, either at imprisonment for life in the penitentiary, or at death.''

The case of *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103, is cited as authority for the holding here. I am frank to say that although I participated in that determination, I gravely doubt the soundness of the reasoning there and my then convictions. In any event the record there is not comparable to the one now under review, for

Jones pleaded not guilty, and was convicted on trial. By his plea he was enabled to combat every issue, particularly the one of guilt. Reppin, handicapped by a plea of guilty, stood as one enjoined to silence. The statute was enacted for such a situation, and I protest its voiding.

Mr. Justice Holland concurs in this opinion.

Mr. Justice Bouck, specially concurring.

I concur in the reversal herein for the reason assigned therefor by Mr. Justice Butler in the opinion of the court.

However, there is one point in that opinion with which I cannot agree. Its language seems to imply that the trial court has the right to withdraw from the jury all consideration of murder of the second degree. Section 6665, C. L. 1921, plainly requires that where a defendant pleads guilty of murder "the court shall thereupon impanel a jury as in other cases, to which shall be submitted, as the sole issue in the case, the question whether the killing was murder of the first or second degree." No words could be clearer than these. It seems to me, therefore, that a failure to submit to the jury the issue so prescribed would be a usurpation of the functions properly belonging to the jury. It is well to remember that, while by statute the common law ordinarily governs criminal procedure in Colorado (C. L. 1921, §7099), the procedure supplied by the above quoted part of section 6665 is in derogation of the common law and should therefore be strictly construed. In other words, I think there is no justification or excuse for not applying that procedure according to the letter and spirit of the statute.

Mr. Justice Burke, dissenting.

Every normal man shrinks from participation, even as a mandatory official duty, in the infliction of the death

penalty. Still more is he inclined to evade protesting a judgment which saves, or may save, human life. Hence, I would gladly acquiesce in this reversal if I could. But the case seems to me so clear and the assignments so groundless I find myself forced to dissent. I think all questions presented, save one, are conclusively answered by Mr. Justice Butler in the court's opinion, in which, with that exception, I concur.

Defendant contends that evidence of other offenses, committed, attempted or planned by him, was erroneously admitted. This contention the court sustains. I think it unsupported by a single pertinent authority and wholly unsupported by reason. Several answers might be made to it. I confine myself to one. This jury, as demonstrated in the opinion, had a single duty to perform, i. e., to fix the penalty. To do that justly it must know on what character of man that penalty was to be inflicted. Was he a poor, ignorant, misguided youth, who, in confusion and desperation, had committed a single offense, or a hardened criminal, much older in experience and iniquity than his years would indicate? It would be an outrage to him not to admit relevant evidence on this subject if it were in his favor, and is equally an injustice to society to exclude it if against him. The rule applicable is not the technical one governing a trial where guilt is the issue, but the rule laid down by statute for the guidance of a judge where the plea is guilty and the duty is imposed upon the judge, with some measure of discretion, to fix the penalty. C. L. 1921, §7095. Under that statute all facts which might guide discretion or aid judgment are inquired into. Nor is the question here even whether, at the time the evidence was admitted, its admission was error. The question is whether, in the present state of the whole record, its consideration was improper. Hereafter, when the plea is guilty of murder, and all the evidence shows first degree, what help may a jury hope from such scant testi-

mony as the court dares take? Again, how often will this rule, invoked for the benefit of one who seeks to hide his past, work to the infinite injury of one who would gladly reveal it?

I think the judgment should be affirmed.

I am authorized to say that Mr. Chief Justice Adams and Mr. Justice Campbell join herein.